**Hanna SHAPIRA, Plaintiff,**

v.

**LOCKHEED MARTIN CORPORATION, Lockheed Martin Energy Research Corporation, Lockheed Martin Energy Systems, Inc., Colin West, and Philip Thompson, Defendants.**

**No. 3:96–CV–691.**

United States District Court,
E.D. Tennessee,
at Knoxville.

July 13, 1998.

Scarlett A. May, Law Offices of Garry Ferraris, Knoxville, TN, William A. Reeves, Wise & Reeves, P.C., Knoxville, TN, for plaintiff.

Edward G. Phillips, Edwin H. Rayson, Jr., Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, Patricia Lane McNutt, G. Wilson Horde, Lockheed Martin Energy Systems, Inc., Oak Ridge, TN, for defendants.

## MEMORANDUM OPINION

JORDAN, District Judge.

This civil action brought under Title VII (42 U.S.C. § 2000e *et seq.*) and the Tennessee Human Rights Act (Tenn.Code Ann. § 4–21–101 *et seq.*) is before the court on the defendants' motion for summary judgment [doc. 23] and amended motion for summary judgment [doc. 42]. The plaintiff has responded to both these motions [docs. 38 and 46], and the defendants have filed replies [docs. 44 and 47]. Oral argument was heard on the motions on April 3, 1998; thus, the motions are ripe for the court's consideration. For the reasons discussed below, the court finds that the plaintiff has failed to show (1) that her gender played any part in the defendants' decisions in 1995 and 1996 to terminate her employment during reductions in force or (2) that the defendants retaliated against her, and the defendants' motions will be granted.

In her complaint, the plaintiff alleges that her supervisors, particularly Colin West and Philip Thompson,[1] discriminated against her because of her gender in selecting her for layoff during two separate reductions in force (RIFs) in 1995 and 1996. She claims that gender discrimination is evidenced by the following facts: that West denied her request to serve as a task leader on the Advanced Neutron Source (ANS) project; that West and Thompson ignored her request to create an electronic bulletin board; that she was excluded from distribution lists for communications from West; that West excluded her from professional staff meetings; that West gave her unwarranted poor performance ratings without soliciting input of coworkers; that after ANS was canceled, West repeatedly interfered with her efforts to find another position by telling prospective supervisors that she was difficult to work with; that West refused to recommend her to work on the Spallation

1. By stipulation of dismissal, Colin West and Philip Thompson have been dismissed as defendants. *See* doc. 16.

Neutron Source project; that Thompson's offer of a job in Central Engineering Services after West selected her for termination in July 1995 was a "sham" because there was not any meaningful work for her to do; that she was again selected for termination during a RIF in 1996 while several male architects and site personnel were retained; that her personnel file was not maintained according to defendants' policies;[2] that West ordered a database she had developed to be deleted from her computer; and that the defendants' Executive Committee failed to fund a computer database project which she had developed. She claims violations of Title VII (42 U.S.C. § 2000e *et seq.*) and the Tennessee Human Rights Act (Tenn.Code Ann. § 4–21–101 *et seq.*) and negligent supervision and retention. In her amended complaint, the plaintiff alleges that the defendants retaliated against her because she complained of gender discrimination.

In their response, the defendants deny that any actions they took, especially related to the RIFs in 1995 and 1996, were because of the plaintiff's gender. They say that the 1995 RIF was necessary because the ANS project, to which the plaintiff was assigned, was canceled, and there was no further need for the plaintiff's services on the project. Concerning the 1996 RIF, the defendants say that the expected funding for a Site and Facilities project at the Oak Ridge Reservation was eliminated from President Clinton's budget in December 1996, and so the anticipated job for the plaintiff on that project never materialized. As to the allegations of gender discrimination, the defendants say that those events either did not happen, were misperceived by the plaintiff, or, as in the case of the deletion of material from her computer, was a mistake that was quickly and completely corrected. The defendants also submit that any claims occurring more than 300 days before her EEOC complaint was filed are time-barred, and that the plaintiff's negligent supervision and retention claims are barred by the rule that Title VII and the THRA are the exclusive remedies for such claims. Finally, the defendants say that they did not retaliate against the plaintiff for making gender discrimination claims.

## BACKGROUND and STATEMENT OF FACTS

In December 1977, the plaintiff was hired as a part-time research associate in the Energy Division of Oak Ridge National Laboratories (ORNL). ORNL is one of three facilities in Oak Ridge managed by Lockheed Martin Energy Systems, Inc. under a contract with the United States Department of Energy.[3] There were approximately 4900 employees at ORNL in 1995. The plaintiff was continuously employed by Energy Systems, either part or full time, from 1977 to March 22, 1996, when her employment was terminated. By training and experience, the plaintiff is an architect with considerable skills in developing concepts as to how buildings should be used, how they should be placed relative to one another, how they would look, and how people and materials flow through them. She has special expertise in using computers to accomplish these tasks.

In 1986, the plaintiff transferred to the Advanced Neutron Source (ANS) project. The manager of this project was Colin West. By 1995, the ANS project had an annual budget of $28 million, either fully or partially supporting between 100 and

---

**2.** This issue has not been pursued by the plaintiff.

**3.** Energy Systems managed ORNL from mid-1980 to January 1, 1996, at which time, under a separate contract, Lockheed Martin Energy Research began to manage and operate ORNL. However, the plaintiff had transferred to Central Engineering Services in October 1995, so the plaintiff was an employee of Energy Systems at all times relevant to this complaint. It is undisputed that Lockheed Martin Corporation is only the parent corporation for Energy Systems and Energy Research, and does not operate any DOE facilities in Oak Ridge. Lockheed Martin Corporation will be dismissed as a party-defendant.

150 Energy Systems employees. Most of these employees were employed at other divisions of ORNL or other Energy Systems organizations such as Central Engineering Services (CES), but were assigned to work full or part-time on ANS. Only eight employees reported directly to West—the plaintiff was one of the eight. The plaintiff worked part-time, mostly on ANS until 1992 when she was made a full-time employee working on ANS. She remained full-time until ANS was canceled in 1995.

Prior to transferring to West's supervision, the plaintiff worked for Energy Division and reported to M.A. Kuliasha. Following a dispute with Kuliasha over an evaluation, Alex Zucker, West's supervisor, recommended that the plaintiff be transferred to West's supervision. She was the only architect assigned to ANS on a regular basis, but there were other architects responsible for "detail design" from other Energy Systems' divisions, especially CES.

While working for West, the plaintiff's evaluations consistently showed that she was performing well on the project. From fiscal year 1987 to fiscal year 1991,[4] the plaintiff received a rating of "CM" (consistently meets expectations for her position). In fiscal year 1992, the plaintiff received a "CX" rating (consistently exceeds expectations for her position). Further, West testified in his deposition, "She did a good job for us on the ANS." See West depos., exh. XII, doc. 25. However, West also perceived that the plaintiff had some interpersonal skills problems. He noted on evaluations done in FY 1987, 1988, and 1989 that she had problems working on a team and, in fact, on her FY 1989 evaluation she was rated as being below job expectations on her interpersonal skills. Thereafter, the plaintiff's evaluations showed that she continually improved in this area. The plaintiff says that she expected her evaluations to be higher so she felt discriminated

against from the beginning of her employment at ANS.

One more point about the plaintiff's evaluations needs to be made. At the time of 1996 RIF, Thompson prepared the form designating the plaintiff as a person subject to termination. On that form he listed her FY 1995 evaluation rating as "CM." The plaintiff says that no evaluation or performance review was done in FY 1995, so Thompson falsified the form. In his second affidavit, Thompson explains, and supports his explanation with documents, that the plaintiff's FY 1995 evaluation was completed in October 1995. However, CES did not complete the performance review process for all its employees until May 1996, after the plaintiff's employment had been terminated. Further, the salary card the plaintiff should have received in February 1996 shows that her FY 1995 evaluation was a "CM."

West says that he held management meetings with the managers of the ANS project from 1986 until the project was canceled. See West affidavit, exh. IX to doc. 44. Initially, only five or six persons, all managers of the various phases of the project were invited to the meetings. West says that the plaintiff complained from the time she started on the project because she was not included in the meetings. West says that he invited only managers, and the plaintiff was not a manager. The plaintiff also says that she was not on the distribution list for memoranda from West. West says that he distributed information on a need-to-know basis; that he had three distribution lists; and that the plaintiff was on two of the three lists. The only distribution list from which she was excluded was the management distribution list because she was not a manager.

In February 1995, Energy Systems was advised that DOE was canceling ANS beginning in FY 1996. Approximately seventy-five employees were at risk of being laid

4. Energy Systems operates on a fiscal year; e.g., October 1, 1995, through September 30, 1996 is FY 1996.

off by September 30, 1995, if they could not be reassigned to other projects at Energy Systems. The plaintiff does not dispute that ANS was canceled or that the employees who worked on ANS were at risk. Instead, the plaintiff says that she should not have been selected for the RIF because of the cancellation of ANS; that she was as qualified for other jobs in Energy Systems as those who were retained.

In his affidavit, West says that he made extensive efforts to find positions for the eight employees under his direct supervision, including the plaintiff. *See* West aff., exh. VIII, doc. 25. West said that he candidly told the managers he contacted of the plaintiff's perceived strengths and weaknesses, especially the quality of her architectural integration work on ANS, as well as her occasional difficulties in dealing with colleagues and accepting ideas and input from others. He says that he told the managers that her skills and hard work outweighed these negatives and that she would be an "excellent addition" to their organizations.[5] West says that these efforts did not bear fruit and no position in other Energy Systems organizations was found for the plaintiff.

By the time ANS was canceled, Thompson had moved from ANS to CES as its manager. CES, a separate division of Energy Systems, employed engineers and architects. In the spring of 1995, Thompson told West that he did not have any work for the plaintiff and, in fact, CES had its own employees who were at risk for layoff, including architects. The only other ORNL organization that employed architects was the ORNL site planning group, but its two architects, R.E. Barstow and J.J. Morello were also at risk. The ORNL

site planning function was being eliminated in September 1995 and both these architects were selected for the RIF along with the plaintiff. Barstow was laid off in the RIF and Morello found a job at K–25, a separate DOE plant, but he was selected for layoff in a subsequent RIF in November 1996.

At about the same time it was announced that ANS was canceled, DOE announced that ORNL and four other laboratories had been selected to receive funding in FY 1996 for the National Spallation Neutron Source (NSNS) project. The funding was limited, and the project was only in the conceptual design stage in FY 1996. No significant building or conventional facilities design was done on NSNS in FY 1996. For the most part, what design work that was needed was obtained from CES.[6] There was no full or major part-time architectural position associated directly with the NSNS. In spite of this, the plaintiff asked West to recommend her for the NSNS project. West told the plaintiff he did not believe that there was sufficient architectural work to be done on the NSNS project to support her full or part-time employment on the project. The plaintiff requested a meeting with B.R. Appleton, the ORNL manager responsible for staffing the NSNS, and told him that he needed her on the project. Appleton explained that the project was still in the conceptual design stage and it was too early in the project for anyone to work on the site and facilities design; in fact, it might not even be ORNL that did the work, but one of the other laboratories. The plaintiff's computer diary reflects that John Cleaves, the Engineering Manager

---

**5.** That West spoke to potential managers in this way is supported by contemporaneous notes made by George Courville whom West called about the plaintiff. Courville wrote: "Hanna Shapira has been working integrating ideas for ANS getting space requirements, etc. He [West] is high on her. I need to talk to Shelton, etc. Maybe in the Kolb slot. Worry about budgets." However, Courville was unable to secure funding to support a position for the plaintiff.

**6.** In fact, the plaintiff did some minimal design work (twenty hours) on NSNS while employed on the ANS project, and later, after she had transferred to CES, she and a co-worker put in about 120 hours on a joint user facility for NSNS and HFIR. This was the total architectural work that was done on NSNS during this time.

on NSNS, also told the plaintiff on May 26, 1995, that there was no work for her to do on NSNS.

After ANS was canceled, West was chosen to head up the High Flux Isotope Reactor (HFIR) upgrade project. Although the plaintiff never specifically asked to be transferred to the HFIR upgrade project, West says there would not have been any work for her to do on the project even if she had.

It is undisputed that there were thirty-three males and two females in Level 3 Task Leader positions on ANS at the time it was canceled. Of these thirty-five employees, twenty-six males and the plaintiff were not assigned to either NSNS or HFIR. The eight ANS employees who were transferred to NSNS and HFIR were engineers and managers with engineering skills, none of whom were assigned architectural design tasks.

In 1995, ORNL developed a written RIF policy (Process for Involuntary Reduction in Force 1995) which the defendants say was followed in the 1995 RIF. *See* Exh. 2 to Trimble aff., exh. VII, doc. 25. The policy requires that each ORNL organization determine how many full-time equivalent positions can be supported by the expected budget. If there are surplus positions; that is, positions that cannot be supported by the budget, management then identifies those positions subject to RIF by payroll and job categories. Next, with the help of Human Resources, management develops "peer groups" of impacted employees.[7] In some situations, an employee may be in a peer group of one if there is no other employee with his or her skills and payroll category. If there are multiple organizations with "at risk" employees in similar peer groups, there are to be joint meetings of the organizations to "validate RIF candidates across organizations." If a person identified for layoff is

in a protected category, a detailed justification for the layoff is required, and adverse impact analyses will be conducted in such cases. Finally, a RIF Review Board will be established to review and approve management decisions regarding employees chosen for the RIF. The organization manager must present the rationale and justification for RIF decisions to the Review Board. Once the Review Board has considered the management decisions, a layoff list is prepared, but no layoff notices are to be sent until final approval by Energy Systems executive management is received.

In the case of ANS, there was no budget at all since the project was canceled, so all the employees working on ANS were "at risk." By July 1995, no other position in ORNL had been found for the plaintiff and she, along with two of West's remaining "at risk" employees, were selected for layoff. West says he placed the plaintiff in a peer group of one because there was no other employee at risk in his organization with the same skills and payroll level. The defendants say that the only possible peers of the plaintiff were architects Barstow and Morello, but their jobs were also at risk since the ORNL site planning function was being eliminated.

On July 26, 1995, West told the plaintiff that she would be receiving her RIF notice within the next few days, effective sixty days later, because no other position at ORNL had been found that could make use of her skills. Sometime later that day, the plaintiff went to Appleton's office to review her personnel file. Appleton's assistant evidently told the plaintiff that only three years' information would be in the file. The plaintiff says that Judy Trimble from Human Resources also told her that only three years of annual performance appraisals are kept unless the employee's

7. For example, as the court understands the process, if it is determined that the budget would only support one secretary but there are three persons in the organization with similar skills and payroll categories, all three persons are put into a peer group and ranked based on their skills, performance reviews, education or training, transferability of job skills, length of service, and time in the position. The person with the highest ranking then retains the one-budgeted position.

performance was below average. When the plaintiff reviewed her file, she found that her personnel file contained nearly eighteen years' evaluations and other materials. After copying all but one letter in her file, she asked the assistant for the name of the EEO Compliance Officer. By affidavit, Fred W. Shull, Jr., a director of the ORNL Human Resources Division, states that there is no Energy Systems' policy requiring that personnel files contain only the latest three years of employee information. *See* Shull affidavit, exh. V, doc. 25. There is a policy that after an employee leaves Energy Systems, the employee's personnel file will be purged of all but the last three years' information.

Also on July 26, 1995, the Review Board met in a scheduled meeting to consider the employees selected for the RIF. The plaintiff was one of the employees to be considered. Thompson was present at the Review Board in order to present his RIF selections from CES. He learned for the first time that the plaintiff and two other ORNL engineers, G.R. Haste and C.L. Hedrick, had been selected for the RIF.[8] Thompson was aware that there was work in CES's safety and site planning groups which was being contracted out of CES. Thompson notified West that he might be able to save these three persons' jobs by keeping the work in-house, and he offered all three employees an opportunity to interview with CES. The plaintiff and Hedrick accepted his offer to interview and they were both offered jobs with CES. Haste declined the opportunity to interview. Hedrick went to work in the CES Safety Analysis group and the plaintiff was to be assigned to CES Site and Facility Planning Group. Because the ANS project was funded until September 30, 1995, the plaintiff was paid out of ANS funds until then. After that date, Thompson paid her out of his limited overhead budget, until an expected budget item for site development work at the Oak Ridge Reservation was

passed by Congress. Unfortunately, 1995 was the year Congress and the President reached a budget impasse and, eventually, the budget item for this work was zeroed out of the proposed DOE budget.

Thus, by December 1995, CES had to initiate another RIF, and fifty-six employees, including the plaintiff, were identified as being at risk. As the court understands it, the same RIF procedures used in the summer of 1995 were used. Again, the plaintiff was placed in a peer group of one. Thompson says this was because she had no peers in Site and Facility Planning or elsewhere in CES. The Review Board and Energy Systems executive management approved the CES RIF. On January 17, 1996, all fifty-six of the identified employees received notice that they were to be laid off in sixty days. Twenty-five of these employees were able to find other positions within the sixty-day period. The remaining employees, including the plaintiff, were laid off on March 22, 1996.

The plaintiff has identified three male architects who should have been placed in a peer group with her, and whom she claims were no better qualified than she for the work to be done. First, she claims that she should have been in a peer group with Morello, who was then employed at K–25, an entirely separate DOE operation. Thompson says that the RIF policy does not allow a manager to "peer group" out of his or her own department, so he could not have placed the plaintiff in a peer group with Morello. *See* Thompson affidavit, exh. VII to doc. 44. In any event, Morello was laid off in a K–25 RIF in November 1996.

Next, the plaintiff says that she should have been considered to be a peer of John Overly. Thompson explains that Overly was classified as an Engineering Specialist, grade 11 and the plaintiff was classified as a Engineer IV, grade 9. *See* Thompson

---

**8.** In mid-July 1995, Thompson learned that R.M. Harrington, a nuclear safety engineer working with ANS was at risk. Thompson needed someone with Harrington's skills to work in the CES Safety Analysis Group, and Harrington was offered an opportunity to interview for the position. Harrington was offered the job and he accepted.

affidavit, exh. VII to doc. 44. Thompson says that the difference in job level and salary grade would prevent her from being a peer of Overly. Further, even if she had been placed in Overly's peer group, everyone in the peer group had a higher job level and salary grade and she would have been chosen for the RIF from that peer group anyway.

Finally, the plaintiff says that she should have been placed in a peer group with Cecil Peters. Peters, like the plaintiff, was an Engineer IV, grade 9. He was an architect in the Structural and Architecture Engineering Department and had received a CX rating (exceeds expectations) every year for the four years he was with that department. Peters was also a licensed architect, and the plaintiff is not, and he had significant prior experience which the plaintiff did not have. In addition, Peters' experience was in detail design work, which was the type of work budgeted. Thompson says that even if the plaintiff had been in Peters' peer group, she would have been selected for layoff before Peters.

While the plaintiff was still with the ANS project and after she transferred to CES, the plaintiff worked to develop a computer database that would compile the qualifications and expertise of Energy Systems employees. The project was known as CAPES. On July 5, 1998, the plaintiff made a presentation to the ORNL Executive Committee seeking further funding for the CAPES project. The Committee ultimately decided not to fund the CAPES project.

Unbeknownst to West or Thompson, the plaintiff attached her CAPES project to the ANS Home Page she helped maintain on the World Wide Web. In February 1996, West was told there was a misleading statement concerning the HFIR project on the ANS Home Page, and West decided to delete the whole Home Page site since the ANS project had been canceled. The plaintiff was out of the country at the time, so he had the other "maintainer" of the site delete the ANS Home Page.

When the plaintiff returned from her trip, she was extremely upset because the ANS Home Page and, unknowingly, the plaintiff's CAPES project had been deleted. West acknowledged that he had ordered the Home Page deleted, but states that he did not know that CAPES was on that Home Page. Energy Systems computer personnel were able to retrieve all of the plaintiff's deleted information within two days of her complaint.

The defendants have submitted the statistical report of David Peterson who was retained by the defendants as a statistical expert. See Peterson affidavit, exh IV to doc. 24 and Peterson affidavit, exh. III to doc. 44. The plaintiff does not dispute that Dr. Peterson is qualified to examine statistical information concerning the 1995 ORNL RIF and the 1996 CES RIF to determine whether there is any statistical indication that the employees' gender may have been a factor in the selection of people to be displaced during either of these RIFs. The plaintiff, however, does have some criticism of his methods and results which will be discussed below.

Dr. Peterson concludes, based on the information provided to him by the defendants, that females selected for displacement were in no greater proportion than similarly situated males during either the 1995 ORNL RIF or the 1996 CES RIF. Therefore, he concludes, there is no statistical indication that the employees' gender had anything to do with the employers' selection of people to be displaced.

Dr. Peterson has prepared three tables and a revised table that explain and support his conclusions. Table 1 shows that of the 41 employees chosen for displacement in the 1995 ORNL RIF, 11 were female. His computations show that, proportionately, one would expect 12.5 females to have been displaced. The gender disparity is 0.94 standard deviations.

Table 2 shows that of the 56 employees chosen for displacement in the 1996 CES RIF, 11 were female. Again, his computations show that, proportionately, one would expect 12.5 females to have been displaced.

The gender disparity is 0.53 standard deviations.

Dr. Peterson prepared an additional table, Table 3, based on some of the plaintiff's criticisms of Tables 1 and 2. Specifically, the plaintiff claimed that Mr. Peterson's statistics were flawed because he considered "displaced" employees rather than "terminated" employees, the difference being that some of the displaced employees may have transferred to other jobs (such as did the plaintiff in the 1995 ORNL RIF). Based on this criticism, Table 3 compares the proportion of females terminated during the 1996 CES RIF. There were 35 employees terminated, 2 of whom were female, including the plaintiff. His computations show that, proportionately, one would expect 4.9 females to have been terminated. The gender disparity is 1.6 standard deviations.

Finally, based upon another of the plaintiff's criticisms; that is, that he should have compared only the Engineer IV, Salary Grade 9 employees who were displaced, Dr. Peterson prepared a revised Table 2 showing only Engineer IV displacements. There were 15 Engineer IV employees displaced in the 1996 CES RIF, 2 of whom were female. His computations show that, proportionately, one would expect 2 female Engineer IV employees to have been displaced. The gender disparity is 0.00 standard deviations.

## LEGAL DISCUSSION

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories and admissions of file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Sixth Circuit has expressly adopted a trilogy of United States Supreme Court cases which clarified the standards for summary judgment under Rule 56. *See Street v. J.C.*

*Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) (adopting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In summary, these cases hold that in order for a non-moving party to defeat a motion for summary judgment, the non-moving party must come forward with persuasive evidence to support his or her claim that there is a genuine factual dispute; that is, the non-moving party must produce evidence on which the jury could reasonably find for the non-moving party. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

The plaintiff's claims are brought under both Title VII and the Tennessee Human Rights Act. The Tennessee courts have made it clear that Tennessee Human Rights Act actions are to be analyzed using the case law the federal courts have developed for corresponding federal discrimination statutes. *See Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.1996). Thus, the plaintiff's claims and the defendant's motion for summary judgment will be considered as if there is no distinction between Title VII and the Tennessee Human Rights Act.

### A. Statute of Limitations

The plaintiff claims she felt discriminated against because of her gender from the beginning of her employment with the defendants about eighteen years ago. The defendants argue that the plaintiff's claims relying on actions allegedly occurring before June 1, 1995, must be dismissed because Title VII requires that charges of gender discrimination be filed with the EEOC within 300 days of the alleged discriminatory acts. 42 U.S.C. § 2000e–5(e).[9]

9. Section 2000e–5(e)(1) provides, in relevant part:

The plaintiff filed her complaint with the EEOC (and the Tennessee Human Rights Commission) on March 30, 1996.

■ A defendant employer is entitled to treat a past act as lawful if the employee fails to file an EEOC complaint related to that action within the allowed statutory period. *See United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977). "A discriminatory act which is not made the basis of a timely charge is the legal equivalent of a discriminatory act that occurred before the statute was passed.... [S]eparately considered, it is merely an unfortunate event in history which has no present legal consequences." *Id.; see also Easter v. Martin Marietta Energy Systems, Inc.,* 823 F.Supp. 489, 496 (E.D.Tenn.1991).

■ The plaintiff, however, argues that there has been a continuing violation of her Title VII rights which would toll the limitations period. The defendant says that the continuing violation doctrine does not apply in this case because a discriminatory act must have occurred within the limitations period, and there is none in this case.

> To establish a continuing violation, plaintiff must first produce evidence of a "current" violation taking place within the limitations period.... Second, plaintiff must show that the current violation, falling within the limitations period, is indicative of a pattern of similar discriminatory acts continuing from the period prior to the limitations period.

*Gallagher v. Croghan Colonial Bank,* 89 F.3d 275, 278 (6th Cir.1996).

As will be discussed below, the court finds that there is no genuine issue of fact that a discriminatory act occurred within the limitations period, thus the continuing violation doctrine does not apply in this case. Any alleged discriminatory act occurring before June 1, 1995, is time-barred.

### B. Plaintiff's Prima Facie Case

■ In a reduction in force case such as this one, the plaintiff must show more than the elements that relate to her job situation as set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[10] *See Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1464–65 (6th Cir.), *cert. denied,* 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). To make out a *prima facie* case in a reduction in force case, the plaintiff must come forward with "additional direct, circumstantial, or statistical evidence that the employer singled out the plaintiff for discharge for impermissible reasons." *Id.* at 1465. "A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Id.* In this case, the court does not understand the plaintiff to be arguing that the RIF"s in 1995 and 1996 were not true reductions in force, but only that she should not have been selected for termination.

In this case, the plaintiff has not provided the court with any direct evidence of gender discrimination. Thus, the plaintiff must meet her burden of establishing a *prima facie* case by presenting circumstantial or statistical evidence that her gender was the reason she was chosen for termination during the two RIFs.

A review of the plaintiff's complaint and her response to the motion for summary

---

A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ... such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred....

**10.** In this case, the *McDonnell Douglas* elements could be satisfied by showing that the plaintiff was female; that she was qualified to perform the job; and that she was discharged. *See McDonnell Douglas,* 411 U.S. 792, 93 S.Ct. 1817, 1819, 36 L.Ed.2d 668; *Barnes,* 896 F.2d at 1465.

judgment reveals that she is relying on the following incidents as circumstantial evidence that she was a victim of gender discrimination:

1. That the defendants' RIF process was flawed because the terms "peer" and "peer group" are not defined and managers had the sole discretion to choose persons for layoff, and, in any event, the defendants did not follow the RIF policy selecting her for the RIFs;

2. That the plaintiff was treated differently than other key male employees at ANS by being excluded from management meetings and omitted from West's memo distribution list;

3. That she was kept unnecessarily on part-time status after she requested full-time work;

4. That she was falsely accused by West of breaching corporate rules;

5. That West repeatedly misrepresented the plaintiff's abilities to potential sources of transfer by saying she was "difficult";

6. That she received unwarranted poor performance ratings from West;

7. That West refused to recommend her for work on NSNS and HFIR;

8. That the transfer to CES was a sham;

9. That she was terminated in the 1996 RIF but comparable male architects were retained; and

10. That West caused her CAPES project to be erased from her computer while she was out of the country.

## 1. Defendants' RIF policy

■ The plaintiff first argues that the defendants' RIF guidelines are flawed because there is no definition of the terms "peer" or "peer group." She bases this argument on the fact that the defendants' statistical expert did not know what those terms mean. The crux of her argument appears to be that in the absence of meaningful definitions of these terms, it was unfair to place her in a peer group of one

during each of the RIF processes. She also claims that she was the only at-risk employee who was placed in a peer group of one during the 1995 and 1996 RIFs.

The court finds that the plaintiff's contention that these "facts" support her claim of gender discrimination is untenable. Concerning the plaintiff's contention that there is no definition of "peer" or "peer group," the court finds that this is incorrect. Part 2 of the "Process for Involuntary Reduction in Force—1995" provides that Organization Managers must identify surplus positions (positions for which there is no anticipated budget) by "payroll and job categories." *See* Attachment to Trimble affidavit, exit. VII, doc. 25. The exhibits attached to the affidavit of Thompson (Thompson affidavit, exh. VI, doc. 25) confirm that this is the definition of "peer group" that was used to group at-risk employees. For example, one such peer group consists entirely of employees designated as Engineer IV, Salary Grade 9. The court finds that there is little or no ambiguity about the formation of peer groups.

The plaintiff is mistaken in her assertion that she was the only person placed in a peer group of one at the time of the 1995 RIF. Trimble points out in her second affidavit that there were seven individuals selected for layoff in July 1995 who were in peer groups of one—four men and three women. *See* Trimble affidavit, exh. VIII to doc. 44. As to the 1996 RIF at CES, there were four individuals in peer groups of one—two men and two women. *See* Thompson affidavit, exh. VII to doc. 44.

Next, the plaintiff argues that management did not follow the RIF policy when selecting her for the RIFs. She says that she was not compared across departments for her "potential for retention." This term appears in the RIF policy under the section setting out the criteria to be used to compare employees within the same peer group. Since the plaintiff was in a peer group of one, the term "potential for retention" does not apply to her.

The plaintiff also says that management should have compared her; that is, placed her in peer groups, with architects from other departments. The RIF policy does not provide for such comparisons. After the peer groups for a particular organization are formed, and the comparisons for potential for retention are made within each peer group, then a list is prepared by the organization's manager of the employees who have been selected for layoff. Once this list is prepared, then the RIF policy requires joint meetings "between those site or functional organizations having employees with the same or similar jobs to validate RIF candidates across organizations." The policy then requires that the criteria used to compare employees in a particular peer group are to be used to compare RIF candidates across organizations. As described by Trimble, these were exactly the procedures followed in both the 1995 and 1996 RIFs. Both West and Thompson placed the plaintiff in a peer group of one because she had no peers within their respective organizations. In the 1995 RIF, the plaintiff was compared across organizations with two other ORNL architects, Morello and Barstow. Barstow was laid off, and Morello found a job with another DOE division, but was laid off in a subsequent RIF.

At the time of the 1996 RIF, the plaintiff was employed by CES, a separate DOE division, in the Site and Facilities Planning (SFP) group. There were three architects in the SFP group in January 1996 when the peer groups were formed, the plaintiff and two males. Both males were classified as Engineer Specialist, Salary Grade 11 architects. Thus, the plaintiff was not a peer of either of these architects. Further, even if she had been put in a peer group with them, she would have been selected for layoff because she had not achieved the same premier grade.

Although there were other Engineer IV, Salary Grade 9 employees in CES who were at risk, these other engineers did much different work than the plaintiff. Thompson says in his deposition that it would have been inappropriate to place the plaintiff in a peer group with these other similarly graded engineers because her qualifications did not meet the qualifications of the budgeted work (civil/structural detailed design work). Further, Thompson explains that even if the plaintiff had been placed in a peer group with the other Engineer IV, Salary Grade 9 architects, she would still have been chosen for layoff because her yearly evaluations were not as high as others, she was not licensed, and she had no significant experience in a private engineering firm as did those retained, especially R.C. Peters.

The plaintiff also complains that Thompson listed her FY 1995 evaluation as CM when, in fact, she had not received a FY 1995 evaluation. Thompson says that all his employees' evaluations were completed by October 1995, but there was no opportunity to have an employee meeting about her evaluation before she was laid off. Further, she knew as of February 1996 when she received her salary card that she had received a CM rating for FY 1995.

Finally, the plaintiff says that the RIF process was flawed because managers were given the sole discretion to determine who would be placed in peer groups and who would be laid off. This is also an incorrect statement. Organization managers made the initial determinations for their organizations, but the RIF Review Board had the responsibility to review and approve line management decisions regarding employees to be RIFed and all lay-offs had to be approved by Energy Systems executive management.

One other comment about the RIF policy might be made here. The policy requires Organization Managers to provide detailed justification for any individual in any protected category who is identified for layoff and adverse impacts analyses will be conducted in all such cases. Workforce Diversity conducted the analyses for both the 1995 and 1996 layoffs, and found that there was no statistically significant adverse impact on the basis of sex among

826

those selected for layoff in either 1995 or 1996.

The court finds that the plaintiff's allegations related to the RIF policy fail to raise a genuine issue of material fact that gender played any part in the application of the RIF policy to the plaintiff.

## 2. Discriminatory treatment

■ The plaintiff says that West's treatment of her while she worked for him demonstrates his discriminatory intent. First, she says that she was not invited to West's weekly staff meetings, and she feels she should have been included. In his second affidavit, West explains why the plaintiff was not invited to these weekly meetings, although she continually complained about not being invited. *See* West affidavit, exh. IX to doc. 44. West says that these meetings were for the managers of the various aspects of the ANS project. Simply put, the plaintiff was not a manager, so she was not invited. Only five or six managers were invited out of the 100–plus employees on the project.

Second, the plaintiff says that West refused to include her name on the interoffice mail distribution list. West says that he distributed information only to those he thought needed to read it so he had three general distribution lists: one for managers, one for technical leaders, and one for those who reported administratively to West. The plaintiff was not a manager, so her name was not on that list. However, the plaintiff was on both of West's other distribution lists.

Finally, the plaintiff repeatedly states that she was one of only two professional and technical women working on ANS. This is also an incorrect assertion on the plaintiff's part. In fact, there were seven professional women working on ANS for significant periods of time, and six female support staff. Thompson points out in his second affidavit that there were fourteen female CES professionals who worked for significant periods of time on ANS. Apparently, the plaintiff assigns herself a superior status as an engineering professional;

however, the defendants' proof shows that there were at least eleven other female engineers assigned to ANS while the plaintiff worked on the project.

The plaintiff has failed to show that being excluded from management meetings and management memo distribution lists when she was not a manager was in any way a sign of gender discrimination.

## 3. Part-time status

■ The plaintiff complains that she was kept at part-time status unnecessarily and this is another example of West's discriminatory animus. Although the actions related to this complaint occurred in 1991–92 and are time-barred, the court will consider this issue as if it was not time-barred. In 1986, rather than resign, the plaintiff agreed to work for Energy Systems part-time. Shortly thereafter, she was transferred to ANS under West's supervision. In December 1991, the plaintiff began requesting that her position be made full time. West says in his second affidavit that the funding was not sufficient to support the plaintiff at a full-time level. *See* West affidavit, exh. IX to doc. 44. In fact, West says that he expected a decrease in funding for the kind of work the plaintiff was doing; however, it was proposed that the budget for ANS in FY 1993 be increased by $1 Million. West says that as soon as learned of the proposed increase in July 1992 he recommended that the plaintiff's position be made fulltime. The recommendation was approved in August 1992. Further, West gave the plaintiff a CX rating in FY 1992 and recommended a pay increase for her to Salary Grade 9.

The plaintiff has not come forward with any evidence that the seven month delay in promoting her to full-time status was in any way related to her gender. She has not produced any fact that would refute West's contention that the funding was not available for her to be promoted to fulltime until the budget increase in FY 1993. In the absence of any such evidence, the

court finds that this incident does not show any gender discrimination on the part of West.

### 4. West's false accusations

The plaintiff says that West accused her of breaching corporate rules by failing to have oral presentation materials "cleared" before she traveled to Israel, when she had had the materials "cleared" before she left. In February 1995, the plaintiff traveled to Israel to present a paper on MORRZ ("Maintenance, Operation and Research (Radiation) Zones Application Model—A Design and Operation Tool for Intelligent Buildings with Application to the Advanced Neutron Source (ANS)") The defendants' evidence shows that the plaintiff was required to have the written paper on this topic reviewed by two peer reviewers, edited by a responsible editor, in this case Kathryn King–Jones, and reviewed, edited and approved by West prior to sending it to Israel for publication. This was finally achieved in December 1994, barely in time to meet the deadline, in part because the plaintiff may not have provided the paper to the reviewers in a timely fashion. In any event, it is also ORNL policy that oral presentation materials, including viewgraphs, must be cleared separately from the publication of the underlying paper. West says in his second affidavit that the plaintiff did not have her oral presentation materials reviewed prior to taking them out of the country, contrary to ORNL policy. *See* West affidavit, exh. IX to doc. 44. He says that copies of the plaintiff's materials were not delivered to him for review until after the plaintiff had left the country with the materials. Further, the plaintiff left the country with the materials prior to obtaining an applicable export license number. West approved the materials "after-the-fact," but the written documents related to this incident show that Laboratory Records did not clear the viewgraphs until after the plaintiff returned from Israel. West says that in the absence of an applicable export license number, the plaintiff could have been detained at United States Customs. When the plaintiff returned to the United States, West confronted the plaintiff about her violation of corporate rules.

The plaintiff says that there was no policy requiring that viewgraphs be cleared separately from the written paper and she did not violate any corporate rules. However, the attachments to the affidavit of Kathryn King–Jones (exh. II to doc. 44) clearly show that the plaintiff failed to have her viewgraphs cleared prior to leaving the country and this was required per ORNL policy. The documentary evidence fails to support the plaintiff's belief to the contrary. The court can find no discriminatory intent on West's part when he confronted the plaintiff with her violation of corporate rules.

### 5. West's alleged misrepresentations to potential sources of transfer

█ The plaintiff alleges that West misrepresented her abilities to every potential source of transfer he talked with during the spring and summer of 1995. She says that she was not "difficult" to work with, and West's characterization of her as such demonstrated his discriminatory animus towards her.

In February 1995, ORNL was informed that the ANS project was being canceled. West says that he tried to place all eight of the persons who reported directly to him in other organizations. There does not appear to be any dispute that West took it upon himself to contact potential sources of transfer for the plaintiff. It is also undisputed that West told these managers that the plaintiff did excellent work in site and facility planning and that she was sometimes "difficult"; that is, she did not readily accept input from others or criticism of her own work. However, West says that he told these managers that her strengths outweighed any problems she might have and that he highly recommended her. The only manager whom he contacted, but with whom he did not discuss the plaintiff's strengths and weaknesses, was Thompson. Thompson was

well aware of the plaintiff's work from the time he worked on the ANS project.

The notes taken by Courville during his conversation with West corroborate West's characterization of what he told potential managers about the plaintiff. Courville's notes show that West told him of the plaintiff's strengths and Courville noted that West "was high on her." [11]

The plaintiff's evaluations (attached to Shapira affidavit, exh. 1 to doc. 38 and West affidavit, exh VIII, doc. 25) show that the plaintiff never received a rating above an "M" (meets job expectations) from West for her Interpersonal Skills. As far back as December 1985, her supervisors were noting on her evaluations that she had some problems in this area. For example, a letter from W. Fulkerson concerning the plaintiff's FY 1986 evaluation states: "To me this is just one more example of our chronic problem with Hanna which is that she has trouble getting along with people with whom and for whom she works." These early evaluations also describe her considerable abilities in her area of expertise and the good work she did on various projects.

In 1988–89, the plaintiff received a "B" (is below job expectations) in the areas of Interpersonal Skills and Attitude. The notes accompanying these ratings are as follows:

INTERPERSONAL SKILLS—In this area, improvements are needed, and during the latter part of the reporting period improvements have been seen. She has not always worked effectively as a part of a team with other parts of the organization—e.g., RRD, site development. The problems have not always been of her making, but a more sympathetic and understanding approach by Hanna would have helped.

ATTITUDE—Is not understanding or sympathetic to the need for detailed policies and procedures within a large organization. Has been enthusiastic about her recent work on the ANS.

The plaintiff never received such a low rating in either area again. The comments related to each of these areas often reflected that she still had problems in each area, but was improving. In fact, from 1991–92 to 1993–94, the plaintiff received an "E" (consistently exceeds job expectations) for her attitude with comments such as, "She shows great enthusiasm for her job." In other areas, the plaintiff was highly rated for the quality of her work and her job knowledge and initiative. Thus, it appears to the court that West valued the plaintiff's contribution to ANS, continued to have concerns about her interpersonal skills, but noted her improvements in this area.

The plaintiff has provided the court with the affidavits and depositions of several coworkers who state that the plaintiff was very good at her job and had no interpersonal problems. See Grossman affidavit, exh. 2 to doc. 38; Maxon affidavit, exh. 3 to doc. 38; Brown deposition, exh. 5 to doc. 38; and Stone deposition, exh. 9 to doc. 38. Attached to the plaintiff's affidavit are several memoranda from coworkers, some going back to 1978, which were in her personnel file. All of these memoranda describe the excellent work the plaintiff is capable of doing and some describe a congenial working relationship with the plaintiff. On the other side of this issue, the defendant has submitted affidavits of two of the plaintiff's coworkers on ANS who believe that she was difficult to work (with). See Campbell affidavit, exh. I to doc. 44; King–Jones affidavit, exh. II to doc. 44.

---

**11.** The plaintiff has attached the affidavit of Gershon Grossman to her response. Mr. Grossman says that he talked with Courville shortly after Courville talked with West. Grossman says that Courville told him that West said that the plaintiff was "good at her work, but difficult." This conversation is clearly hearsay and inadmissible evidence. Fed.R.Civ.P. 56(c) (affidavits must set forth facts admissible into evidence). Courville stated in his deposition that he has no recollection independent of his notes related to his conversation with West.

In spite of the fact that there is a difference of opinion concerning whether the plaintiff was "difficult" to work with, the court finds that this does not raise a genuine issue of material fact. In the Sixth Circuit, it is the manager's motivation that is the key factor, not the employee's perception or even the perception of her coworkers about the employee's abilities or skills. *See, e.g., Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987). The plaintiff has done nothing more than infer that West's description of her to potential sources of employment was based on discriminatory animus. There is no evidence of this in the record. West, as the manager of the project to which she was assigned, documented his perceptions of the plaintiff's interpersonal skills as early as 1987–88. The fact that he continued to believe that the plaintiff needed improvement in this area is supported by years of evaluations.[12] The plaintiff has not produced any evidence upon which a jury could find that West's motivation in telling potential sources of employment that the plaintiff was a very talented architect, but had some interpersonal skills problems, was the plaintiff's gender.

## 6. Plaintiff's unwarranted poor performance ratings

The plaintiff says that her poor performance ratings by West are examples of his discrimination against her because of her gender. Again, it must be noted that any evaluations completed before June 1, 1995, are time-barred incidents. In any event, as discussed above, the court finds that a reasonable jury could not find that the plaintiff was discriminated against because of her gender based on her evaluations. There is absolutely no evidence in the record that West was motivated to give the plaintiff poor performance rating because she was a female. Further, West's evalua-

tions of the plaintiff in all areas except her interpersonal skills were usually very favorable.

## 7. Refusal to recommend plaintiff to work on NSNS and HFIR

■ The plaintiff claims that West refused to recommend that she be assigned to NSNS and HFIR and this refusal was another sign of gender discrimination. When news of the cancellation of the ANS project reached the employees, the plaintiff requested that she be assigned to NSNS but West told her that there was no work for her to do on that project. She requested a meeting with B.R. Appleton who told her the same thing. In May 1995, the Engineering Manager of NSNS, John Cleaves, also told the plaintiff that there was no work for her to do on NSNS. As to the HFIR project, the plaintiff never specifically asked to be assigned to that project, but West, the new manager of the project, says that there was no work for her on that project, either.

All of the events related to these two projects request occurred prior to June 1, 1995, and, thus, are time-barred. Nevertheless, the plaintiff merely assumes the West's motivation for not recommending for these projects was because of her gender. She has not produced any evidence that male architects with similar skills were assigned to either of these projects instead of the plaintiff. In fact, only eight ANS employees transferred to these projects and none of them were site and facility planning architects. There is nothing in the record to support any kind of reasonable inference that she was not recommended for these projects because she was a female.

## 8. Transfer to CES a sham

■ The plaintiff claims that Thompson's last minute job offer was merely one

12. The court recognizes that it would be a different situation if the plaintiff's evaluations had never revealed problems with coworkers, but West suddenly began telling prospective sources of employment that she was "difficult" in 1995. *Cf. Canitia v. Yellow Freight*

*System Inc.,* 903 F.2d 1064, 1067 (6th Cir.), cert. denied, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990) (disparity in disciplinary action prior and subsequent to an employee's protected activity may be evidence of discrimination).

step in the defendants' efforts to get rid of her because she was a female. She says that the timing of the job offer was suspicious and there was never any meaningful work for her to do for CES, so by offering her a job at CES, the defendants were setting her up to be laid off in the next RIF. The events related to this allegation begin on July 26, 1995, when West told the plaintiff that no work had been found for her at ORNL and she should expect to receive her termination notice in a few days. Later that day the plaintiff went to Appleton's office to review her personnel file. While there, she requested the name of the EEO compliance officer. When she returned to her office, West told her and two other employees that there was a possibility of some funding on the HFIR Guide Hall and asked these employees to help him secure that funding. The plaintiff admits in her affidavit that it was possible funding on the HFIR Guide Hall that was discussed at that meeting.

On the evening of July 26, 1995, the RIF Review Board met to consider the Organization Managers' selections for layoffs. Judy Trimble presented the employee list for West. Thompson attended the meeting to present his layoffs from CES. Thompson says that it was at this meeting that he learned that the plaintiff and two other ORNL engineers, Hedrick and Haste were among those selected for layoff. Thompson decided to offer all three of these ORNL engineers an opportunity to interview for positions with CES that he thought he could fund. In the case of the plaintiff, Thompson says that he expected funds to be approved by Congress for work on Oak Ridge Site and Facility Planning. Thompson believed that he could

fund positions for Haste and Hedrick by keeping some subcontracted work in-house.

The next morning, Thompson talked with West and the plaintiff and told them he was offering the plaintiff an opportunity to interview for a position with CES. The plaintiff accepted his offer and was hired to work with the Site and Facility Planning Group. By December 1995, however, the expected funding for the plaintiff's work was zeroed out of the budget.

Based on this sequence of events, the plaintiff first argues that the timing of West's announcement of a possibility of funding on the HFIR Guide Hall and Thompson's job offer are suspect because each offer came within a few hours after she had inquired about the EEO compliance officer. There is no evidence that Thompson or West had any information on July 26, 1995, that the plaintiff had requested the name of the EEO compliance officer. In their second affidavits, both Thompson and West deny that they had any such information. The plaintiff only suggests that they "could" have known. The court finds that in the absence of any evidence that either Thompson or West knew that the plaintiff was seeking EEO information, the court cannot draw the inference the plaintiff proposes.

Next, the plaintiff says that Thompson's job offer was a sham because there was not any meaningful work for her to do. Thompson admits that he asked the plaintiff to continue to work on her CAPES project for the duration of her ANS funding and thereafter, until the expected funding for Site and Facility Planning was approved by Congress. In addition to working on CAPES, the plaintiff was evidently assigned to some short-term projects, including one related to NSNS,[13] but

---

**13.** In fact, when Appleton learned that the plaintiff was doing some limited work on NSNS under John Cleaves, he became concerned lest the plaintiff be led to believe that there was sufficient work for her on the NSNS project to begin requesting assignment there again. In his deposition, Appleton mistakenly says that he discussed this situation with Cleaves in December 1995 and mentioned that this "lawsuit was in the works." Later, the defendants say that Appleton admits that this statement could not have been true because the lawsuit was filed after the plaintiff was laid off in March 1996. However, the defendants did not include the deposition page upon which this admission was made.

it is true that the expected work for her to do at CES never materialized.

Once again, the plaintiff has failed to produce any evidence that the job offer by Thompson was a "sham" to disguise his discrimination against the plaintiff because she was not given any meaningful work to do for the eight or so months she worked at CES. There is one other fact that tends to disprove the plaintiff's theory. If Thompson were merely creating a "sham" job offer to set up the plaintiff for a future layoff, it is inconceivable that he would have included other ORNL employees in the plan. Hedrick and Haste were offered opportunities to transfer to CES at the same time as the plaintiff, and Harrington had been hired by CES only a month or so before. The court finds that the there is no genuine issue of material fact concerning these events, and the plaintiff's claims on this issue do not support her claims of gender discrimination.

### 9. Comparable male architects were retained instead of the plaintiff

 In her deposition, the plaintiff identified male architects at CES that were retained at the time of the 1996 RIF, and who should have been laid off instead of her. Specifically, she says that she should have been retained over J.J. Morello, John Overly, and Cecil Peters. As set out in the court's discussion of the facts, the plaintiff could not have been retained over Morello because he worked for an entirely different division, K–25, and she had no right to "bump" him from his position. The plaintiff could not have been retained over Overly because Overly had achieved a premier grade—Engineer Specialist, Salary Grade 11. The plaintiff was only an Engineer IV, Salary Grade 9. Finally, the plaintiff says that she should have been retained instead of Peters. Peters, like the plaintiff, was an Engineer IV, Grade 9, but using the comparison criteria set out in the RIF policy, the plaintiff does not compare favorably with Peters.[14] Peters received CX (exceeds expectations) ratings on every evaluation in the four years he worked for CES in Structural and Architecture Engineering Department, and the plaintiff's ratings were CM (meets expectations); Peters was a licensed architect, and the plaintiff was not; Peters had significant prior experience which the plaintiff did not; and Peters' experience was in detail design work, unlike the plaintiff's experience. Thompson says that the position for which Peters was retained required detail design work. Thus, Thompson says, the plaintiff could not have been retained and Peters laid off, and this court agrees.

The plaintiff has not shown any discriminatory animus on the part of Thompson for choosing her for layoff over these three male employees. The mere fact that male employees are retained instead of female employees in a RIF does not satisfy the plaintiff's burden of producing evidence that she was chosen for layoff because of her gender. *See, e.g., Barnes,* 896 F.2d at 1465 (a *prima facie* case cannot be established in a reduction in force case simply by showing that younger persons were retained in jobs the older plaintiff could have performed).

### 10. Erasure of the plaintiff's CAPES project

The plaintiff claims that West ordered the erasure of her work on CAPES in order to discriminate against her. This claim borders on the frivolous. There is absolutely no evidence that West or anyone else connected with the ANS Home Page had any idea that the plaintiff's CAPES project was attached to the ANS Home Page. When West ordered the ANS Home Page deleted, it was because ANS had been canceled, and because there was a misleading statement concerning HFIR on the Home Page. When plaintiff discov-

---

**14.** These criteria are: (a) possession of critical skills; (b) performance reviews over the previous three years; (c) education/training relevant to the job; (d) transferability of job skills; (e) length of service with the company; and (f) time in position.

ered that her work had been deleted, computer personnel were able to retrieve all of her information within two days.

The plaintiff's circumstantial evidence is much like the false syllogism discussed in *Crawford v. Medina General Hospital*, 96 F.3d 830, 836 (6th Cir.1996). The plaintiff's reasoning is: (A) negative employment actions occurred involving the plaintiff; (B) the plaintiff is a female; (C) the negative employment actions occurred because she is a female. To paraphrase the court in *Crawford*, there is virtually no evidence, apart from the plaintiff's self-serving conclusions, that any of the actions taken by the defendants, West, or Thompson were in any way related to the plaintiff's gender. *Id.* The court finds that the plaintiff has failed to show that her circumstantial evidence demonstrates that the defendants singled out the plaintiff for discharge for impermissible reasons. *See Barnes*, 896 F.2d at 1465

Even though the plaintiff has failed to produce any direct or circumstantial evidence of gender discrimination, she can still meet her burden of establishing a *prima facie* case by presenting statistical evidence that demonstrates that she was chosen for discharge for impermissible reasons. *Id.* In this case, however, the only statistical evidence before the court has been prepared and submitted by the defendants.

As set out in the factual discussion above, Dr. Peterson, the defendants' expert, concludes that there is no statistical indication that the employees' gender had anything to do with the employers' selection of people to be displaced in the 1995 ORNL RIF or the 1996 CES RIF or to be actually terminated in the 1996 CES RIF. Nor is there any statistical indication that Engineer IV females were disproportionately displaced in the 1996 CES RIF.

In response to this statistical evidence, the plaintiff states in her response: "Dr. Peterson's Affidavit is so flawed it is meaningless in accomplishing its stated purpose." First, the plaintiff argues Dr. Peterson's analysis was flawed because he

considered "displaced" employees; that is, employees who were chosen for layoff whether they transferred to other positions or not, instead of "terminated" employees. The court does not understand the significance of this distinction. The plaintiff has not provided the court with any statistical analysis showing how this distinction would alter Dr. Peterson's conclusion. In any event, Dr. Peterson did a separate table showing only those employees actually terminated in the 1996 CES RIF (Table 3) and that table shows that only 2 of the 35 employees terminated were females, while one would expect 4.6 females (proportionately) to have been terminated.

Second, the plaintiff criticizes Dr. Peterson's report because he was not provided the "adverse impact analysis" generated by Energy Systems as required by the RIF guidelines. Again, the plaintiff has not submitted any statistical evidence to show that if Dr. Peterson had considered the adverse impact analysis, his conclusions would have changed.

Finally, the plaintiff suggests that Dr. Peterson should have computed the gender disparity for Engineer IV employees displaced in the 1996 CES RIF. The plaintiff says, without any statistical support, "When the 'displaced' Engineer IV employees are analyzed, the impact on females is more substantial than the 'beyond [three] standard deviations from the hypothesized random result' found in *Barnes*." A footnote to this statement states: "The displacement of female Engineer IV employees was 50%, which is 2.5 times greater than the percentage of male Engineer IV displacements, and results in females comprising only 3.7% of the Engineer IV employees after the 1996 CES RIF." This calculation by the plaintiff was achieved by reconstituting the peer groups and combining all the Engineer IV employees into one group as if they were equal. As the defendants point out in their brief, the Engineer IV designation includes all the engineering disciplines, not

just architects. By combining all the Engineer IV employees into one group (69), 4 of which are women, and then assuming that 15 of the 69 will be chosen at random for displacement, Dr. Peterson states that the exact probability that two or more females would have been among the 15 people randomly selected is 0.290, which equates to a gender imbalance of 0.55 standard deviations.

The court finds that the plaintiff has not come forward with any statistical evidence to support her contention that she was singled out for discharge for impermissible reasons, nor has she presented any evidence that Dr. Peterson's statistical results were flawed.

Therefore, the court finds that the plaintiff has failed to make out a *prima facie* case of gender discrimination in this reduction in force case.

### C. Plaintiff's Retaliation Claim

After the defendants filed their motion for summary judgment, the plaintiff moved to amend her complaint and add a retaliation claim (42 U.S.C. § 2000e–3). Subsequent to this motion, the defendants amended their motion for summary judgment on this issue [doc. 42] and the plaintiff has responded to the defendants' amended motion [doc. 46]. In her amended complaint, the plaintiff alleges that the defendants retaliated against her because (a) she participated in a gender discrimination investigation in 1986; (b) the defendants perceived that the plaintiff had made a complaint of sex discrimination in 1991 or 1992; and (c) she reviewed her personnel file in 1996 and made statements to the effect that she believed she was being discriminated against because of her sex. The plaintiff alleges that the retaliatory conduct continued during 1995 until she was laid off in 1996. Specifically, the plaintiff says that the defendants failed to fairly consider her for positions for which she was qualified and to advise her when such positions were available; continued to make misstatements of fact concerning her qualifications and personality; and re-stricted her from working on existing projects for which she was qualified.

■ There are two threshold matters that need to be addressed before considering the substance of the plaintiff's retaliation claims. First, it is not clear from the record whether the plaintiff filed an EEOC complaint on her retaliation claims. In the absence of such a complaint and exhaustion of her administrative remedies on this Title VII claim, this court does not have subject matter jurisdiction over the plaintiff's retaliation claim. *See Love v. Pullman Co.,* 404 U.S. 522, 523, 92 S.Ct. 616, 617, 30 L.Ed.2d 679 (1972); *Ang v. Procter & Gamble Co.,* 932 F.2d 540, 545 (6th Cir.1991); *Lacy v. Bentsen,* 859 F.Supp. 1039 (E.D.Mich.1993), *aff'd without publ. opinion,* 25 F.3d 1049 (6th Cir.1994). However, the defendants did not raise this defense in their motion for summary judgment, so the court will consider the plaintiff's retaliation claim as if it was properly before the court. Second, any claim of retaliation based on events occurring prior to June 1, 1995, are time-barred for the same reasons that actions related to the plaintiff's sex discrimination claims are time-barred.

■ In its motion for summary judgment on the plaintiff's retaliation claims, the defendants argue that the plaintiff has failed to establish a *prima facie* case of retaliation, nor has the plaintiff shown that West's actions were retaliatory. In order to establish a *prima facie* case of retaliation, a plaintiff must establish that (1) she engaged in an activity protected by Title VII; (2) that the employer knew that the plaintiff had engaged in such activity; (3) that the employer thereafter subjected her to an adverse employment decision; and (3) a causal link exists between the protected activity and the employer's action. *See Canitia v. Yellow Freight System, Inc.,* 903 F.2d 1064, 1066 (6th Cir.), *cert. denied,* 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). If the plaintiff is able to establish a *prima facie* case, the burden of production shifts to the defendant to

" 'articulate some legitimate, nondiscriminatory reason' for its actions. The plaintiff, who bears the burden of persuasion throughout the entire process, then must demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) and *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981)).

■■■ Although the plaintiff alleges that she participated in some sort of protected activity in 1986, the court is not aware of the nature of this activity, and it is certainly too remote to have any applicability to the issue of the plaintiff's termination ten years later. Concerning the plaintiff's allegations related to events occurring in 1991 and 1992, there were some rumors in 1991 that the plaintiff was complaining that she was being discriminated against by West because he would not promote her to full-time employment. West found out about these rumors, took them seriously, and reported them to his supervisor, B.R. Appleton. Appleton advised West to once again explain to the plaintiff why she was not being promoted to full-time (lack of funding), and West did this. No more was said or done concerning this matter except that within a short time, additional funding was expected that allowed West to request a promotion for the plaintiff to full-time and a salary increase. The plaintiff suggests that West kept this matter in the back of his mind until he had an opportunity to act on it in 1995. These events cannot form any basis for the plaintiff's retaliation claim because they are time-barred and because they are simply too remote to have any relevance to any actions West took in 1995.

Next, the plaintiff suggests that the events connected with her MORRZ paper and the trip to Israel were merely efforts on the part of West to justify his criticisms of the plaintiff. Again, these events occurred in November 1994 and February 1995 and are time-barred as a basis for the plaintiff's retaliation claim. In any event, as discussed above, the plaintiff's subjective belief that she did not need to have her viewgraphs approved before she left the country with them is not supported by the documentary and testimonial evidence, so West's criticism of the plaintiff was justified. Further, the court simply cannot see the connection between these events and West's selection of the plaintiff for layoff in July 1995. To have any connection, these events somehow would have to be tied to the 1991 rumors, and there is no such connection. It is incredible to believe that a manager would "lie-in-wait" for four years to find a reason to criticize an employee.

Finally, the plaintiff says that West and Thompson conspired to offer her a "sham" position with CES because she had asked to see her personnel file and requested the name of the EEO compliance officer on July 26, 1995. It is these allegations alone upon which the plaintiff's claim of retaliation must rest. In this case, the court finds that the plaintiff is able to establish only the first element of her *prima facie* case of retaliation. She has not shown, other than speculation on her part, that either West or Thompson knew that the plaintiff had requested EEO information on July 26, 1995, before making a job offer on July 27, 1995. Both West and Thompson state in their affidavits that they did not know of the plaintiff's request. Nor is there any circumstantial evidence that would lead to an inference that they did know. So, the plaintiff has not established the second element of her *prima facie* case.

Next, the plaintiff must show that she was subjected to an adverse employment action. As discussed above, the court finds that there is no evidence that the job offer at CES was a "sham" so it could not have been an adverse employment action. The only adverse employment action was the plaintiff's selection for layoff in the 1996 CES RIF. However, the plaintiff has not shown how her layoff was "caused" by

her request for EEO information eight months earlier. Further, she has not produced any evidence that incidents occurred while she was working at CES that would connect the July request for EEO information to her selection for layoff in March the next year.

Even assuming that the plaintiff could establish all four elements, she has not shown that the defendants' reasons for laying off the plaintiff were pretextual. The defendants say that the plaintiff was laid off in a legitimate reduction in force. Any allegations that the plaintiff might have that the defendants' explanation is pretextual have been thoroughly discussed above in connection with the plaintiff's failure to establish her *prima facie* case of gender discrimination, and they will not be repeated here. Suffice it to say that the plaintiff has not made out a claim of retaliation for her protected Title VII activity.

## CONCLUSION

For the reasons discussed above, the court finds that there are no genuine issues-of material fact that the defendants discriminated or retaliated against the plaintiff based on her gender. The defendants' motion and amended motion for summary judgment will be granted, and the plaintiff's claims under Title VII and the Tennessee Human Rights Act will be dismissed. The court declines to exercise its supplemental jurisdiction over the plaintiff's common law claims of negligent retention and supervision. An Order reflecting this decision will be filed contemporaneously with this opinion.