**Oliver S. MESSNER, Plaintiff,**

v.

**LOCKHEED MARTIN ENERGY SYSTEMS, INC., Defendant.**

No. 3:99–cv–60.

United States District Court, E.D. Tennessee.

Oct. 24, 2000.

David A Burkhalter, II, Kirk J Angel, Burkhalter & Associates, Knoxville, TN, for plaintiff.

Edward G. Phillips, Edwin H. Rayson, Jr., Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, Patricia Lane McNutt, Kenneth M. Brown, Lockheed Martin Energy Systems, Inc., Oak Ridge, TN, for defendant.

### MEMORANDUM OPINION

PHILLIPS, United States Magistrate Judge.

Defendant, Lockheed Martin Energy Systems, Inc. (LM), has moved the court for an order granting it summary judgment and dismissing plaintiff's complaint [Doc. 11]. Plaintiff has responded [Docs. 22, 28]. Defendant has replied to plaintiff's response [Doc. 30]. Plaintiff has filed a supplemental memorandum in opposition [Doc. 33], to which defendant has filed a response in opposition [Doc. 57].

Plaintiff, Oliver S. Messner (Messner) alleges age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 626, and the Tennessee Human Rights Act (THRA), Tenn.Code Ann. § 4–21–101, et seq.

### BACKGROUND

Messner, who was 64 when he was terminated in April 1998, was hired by LM's predecessor contractor, Union Carbide Corporation, on May 31, 1977 [Messner Dep. at 163]. Plaintiff, a degreed mechanical engineer, worked from 1977 until 1991 in various organizations and positions, specializing in heating, ventilating, and air conditioning (HVAC) design for nuclear components manufacturing and chemical processes. In September 1991, Messner transferred into the Y–12 Engineering Organization and became the project engineer for Y–12's In–House Energy Management Program (IHEM). From 1991 until his termination in 1998, he was classified as an Engineer IV, Level 9, project engineer, assigned to the IHEM program [Dobbs Aff. ¶ 4].

Since April 1984, pursuant to a contract with the United States Department of Energy (DOE), LM had managed, operated, and maintained three major government-owned facilities in Oak Ridge, Tennessee: the Y–12 Plant (Y–12), the K–25 Site (K–25) and the Oak Ridge National Laboratory (ORNL). Effective January 1, 1996, Lockheed Martin Energy Research Corporation (Energy Research), a sister corporation of LM, became the management and operating contractor for ORNL. Effective April 1, 1998, Bechtel Jacobs Company, LLC (Bechtel Jacobs) became the management and integration contractor

for K–25, now known as the East Tennessee Technology Park (ETTP) [Pierce Aff. ¶ 2].

According to defendant, due to Congressional budget reductions, LM's Central Engineering Services organization (CES), where Messner worked, was forced to conduct a series of reductions in force between 1995 and 1998. In January 1998, because of further budget reductions and a need to refocus its efforts from supporting five facilities to one facility, LM determined that another reduction in force (RIF) was necessary for CES. Plaintiff was one of 28 CES employees involuntarily affected by this RIF, which was announced on February 27, 1998.

### CENTRAL ENGINEERING SERVICES

CES was one of LM's central organizations, providing engineering support for the operations of the three Oak Ridge facilities, plus LM's facilities at Portsmouth, Ohio and Paducah, Kentucky. When Bechtel Jacobs assumed the operation of ETTP, effective April 1, 1998, CES became the Engineering Division of the Y–12 Plant, and was no longer responsible for providing engineering support to the other four plants, except on a limited *ad hoc* basis [Dobbs Aff. ¶ 2].

At the time Messner was given the RIF notice in February 1998, Norman Dobbs, then age 54, was the acting director of CES [St. Clair Dep. at 6]. Ed St. Clair, then age 50, was the Y–12 Engineering Site Manager. *Id.* Fred Felte, then age 57, had been plaintiff's immediate supervisor from about 1993 until the RIF [Messner Dep. at 25–26; Felte Aff. ¶ 2]. Felte reported to St. Clair.

Interestingly, a series of RIFs had occurred in CES prior to the one that affected Messner. By September 30, 1997, CES had reduced its workforce by over 40% through a series of DOE-approved voluntary reduction programs (VRIFs), early-retirement incentives, and involuntary RIFs. By April 30, 1998, after the plaintiff's RIF and the transition of certain employees to Bechtel Jacobs, the number of employees in CES had dropped to 390, a reduction of over 60% from 1992 levels [Dobbs Aff. ¶ 3].

### BECHTEL JACOBS

In the summer of 1997, CES began planning to transfer a large number of its employees to Bechtel Jacobs effective April 1, 1998. With respect to engineers, defendant notes that LM was required to transfer engineers who were primarily funded by the environmental maintenance (EM) work that DOE was transitioning from LM to Bechtel Jacobs. LM indicates that **plaintiff had not performed any EM work** and, therefore, was not eligible to be transferred to Bechtel Jacobs [Dobbs Aff. ¶ 7; Messner Dep. at 52]. CES transferred 145 employees to Bechtel Jacobs effective March 31, 1998 [Dobbs Aff. ¶ 7, Ex. A].

### IN–HOUSE ENERGY MANAGEMENT PROGRAM

For approximately seven years prior to his RIF, plaintiff was the project engineer for the IHEM program at Y–12 [Messner Dep. at 25–26, 62–63, 79–80; Felte Dep. at 15]. The purpose of the program was to reduce Y–12's energy consumption by retro-fitting buildings to make the mechanical and electrical systems more energy efficient. The IHEM projects were largely HVAC-based, which was Messner's underlying area of expertise [Dobbs Aff. ¶ 5]. Messner noted that he worked with others to identify "potential studies and projects" and then prepared requests to fund certain ones [Messner Dep. at 62–63]. If the DOE funded a project, plaintiff coordinated the design and construction, reported on the status, tracked the costs, and saw that the project was completed [Messner Dep. at 65–66]. Plaintiff did not actually do the design engineering for the projects; rather, as he explained it, "[w]hat I did was check the work. Sometimes I'd review calculations, and I reviewed and signed drawings." The design engineering, which was primarily HVAC-based, was done either by "individuals reporting

directly to Ed Pierce or subcontractors" [Messner Dep. at 67–68].

The HVAC design engineers supporting the IHEM projects, supervised by Pierce, worked in the Site Support Group of the IHEM section of the Technical Specialities Department in a completely separate division of CES from Messner. Pierce reported to Mike Davenport, at that time the Manager of Technical Specialities, who in turn reported to R.M. Cannon, the manager of Facility Engineering Services. Cannon reported directly to Dobbs [Dobbs Aff. ¶ 6].

Defendant notes that by early 1998, the IHEM program had been "severely reduced and was essentially finishing up a few remaining projects" [St. Clair Dep. at 33–34]. In the Conference Agreement to the FY 1996 Energy and Water Development Appropriations Act, Congress **had terminated** DOE's IHEM program, Pub.L. 104–106, 109 Stat. 402; *see* 104 Cong. Rec. H11504 (October 31, 1995). Congress specifically rejected DOE's $5.7 million request to fund the IHEM program for FY 1997, *see* H. Rept. 104–782 at 92, and has provided no further funding for the IHEM program to date. Plaintiff admits that "the DOE funding for [the IHEM program] was declining" [Messner Dep. at 37–38], and that his IHEM work had decreased dramatically from FY 1997 to FY 1998. During FY 1997, Messner had completed eight IHEM projects and had approximately six other projects ongoing [*Id.* at 70]. At the time of his layoff in April 1998, plaintiff had only one active IHEM project in construction and one project in design [*Id.* at 71–72]. The rest of the projects had been completed or canceled [*Id.* at 72]. By the time Messner's job was eliminated, the IHEM work took up less than 20% of the time of the employee who absorbed plaintiff's work [Davenport Aff. ¶ 6].

## MESSNER REJECTS ASSIGNMENT TO ENRICHED URANIUM OPERATIONS (EUO)

Defendant indicates that prior to June 1998 (when production was resumed), Y–12 was preparing to "restart" the EUO. This was considered to be an important project for Y–12 [Messner Dep. at 153; *see also* St. Clair Aff. ¶ 7]. The EUO restart work required an extensive reconstruction of the design basis, as well as addressing maintenance issues and facility upgrades development of new or improved procedures, verification of procedures and readiness reviews [St. Clair Aff. ¶ 7]. As a part of the restart activities, the status of the HVAC systems in Buildings in 9212 and 9215 at Y–12 had to be assessed. A part of this work involved verifying that the HVAC systems were documented on accurate drawings [Messner Dep. at 155–57; St. Clair Aff. ¶ 8]. Several CES engineers, including two project engineers other than the plaintiff, had been assigned to assist with this work.

In late July or early August 1997, the manager in charge of this work, George Trieste, asked St. Clair if Messner could be assigned to the EUO project[1] [St. Clair Aff. ¶ 8]. Since St. Clair was aware that the IHEM program "was going down in funding," he agreed that Messner would be a "good match based on Oliver's background and the needs of restart at that time in the HVAC arena" [St. Clair Dep. at 59, 61]. Thus, in early August 1997, St. Clair assigned Messner to work with Trieste in EUO [Messner Dep. at 156; St. Clair Dep. at 59–60; St. Clair Aff. ¶ 8]. Messner, however, reacted negatively to the assignment before it even began. He told St. Clair, "I was willing to go up there, but I was not happy about it because I had five projects I was trying to get completed in [IHEM]" [Messner Dep. at 156]. On August 13, 1997, within a week after being assigned to EUO, Messner sent an e-mail to Felte complaining,

---

1. Trieste was familiar with Messner because they had previously worked together on an IHEM Project in Building 9212 [Messner Dep. at 154; St. Clair Dep. at 61].

"The more I think about being railroaded down to RESTART the madder I get" [Felte Aff. ¶ 3, Ex. A]. Messner referred to the assignment as "dogwork," opined that the task was better performed by "HVAC persons" rather than "project engineers" and suggested that some of the HVAC design engineers in IHEM who worked for Pierce, or Pierce himself, be assigned to do the work because "[a]ll of these guys are younger than I and better able to adapt to the drastic change in the nature of that work." *Id.* When St. Clair stopped by to check on Messner, he determined that plaintiff was not happy with the assignment; thus, he removed Messner from the restart assignment and returned him to the IHEM work [St. Clair Dep. at 63–66; St. Clair Aff. ¶ 8]. According to Dobbs, had Messner accepted the assignment to the EUO restart effort, he would likely still have a job there today. S.O. Santich, an HVAC design engineer assigned to HVAC-related work on the EUO restart at the same time as Messner, is still employed on that project [Dobbs Aff. ¶ 16]. Messner has acknowledged that if he had not objected to the assignment, "I would still have a job" [Messner Dep. at 208].

### THE RIF PROCESS

Beginning in 1995, LM developed RIF guidelines to assist managers in their selection of employees for a RIF [Dobbs Aff. ¶ 8, Ex. B], Defendant contends the policy was followed in the 1998 RIF. Under the guidelines, management first identifies the number of surplus positions in the organization by determining the number of positions which can be supported by the budget. The management of each affected organization then studies the jobs/functions to be performed and identifies those jobs/functions which can be eliminated. The next step is to determine the appropriate "peer jobs/functions" which can be eliminated, and to determine the appropriate "peer group" for each job identified for a reduction. A peer group typically consists of employees in the same classification within the organization performing the same or similar types of work. The employees are then ranked based on six criteria: 1) possession of critical skills; 2) performance reviews over the last three years; 3) education/training relevant to the job; 4) transferability of job skills; 5) length of service; and 6) time in position [Dobbs Aff. ¶ 8, Ex. B; Dobbs Dep. at 54–55].

Management then submits its recommendations to a "RIF Review Board" [Dobbs Aff. ¶ 8, Ex. B], composed primarily of managers and representatives from LM's various human resources organizations. The purpose of the RIF Review Board "is to ensure fairness, equity, consistency and defensibility of RIF decisions" [*Id.*, Ex. B]. Under the RIF guidelines, management must be prepared to provide the RIF Review Board with a detailed rationale/justification for the proposed selection of any employees in "protected categories" (*e.g.*, females, minorities, or persons over age 40). *Id.* The RIF Review Board may require modification of the RIF lists to meet workforce diversity concerns, and it must approve the final RIF lists before the RIF can be implemented. Once the final RIF lists are approved by the RIF Review Board, they are reviewed and must be approved by upper management [Dobbs Aff. ¶ 8, Ex. B].

In early 1998, it was determined that St. Clair's organization had to eliminate three project engineers and two additional staff employees [Dobbs Dep. at 22–23; St. Clair Dep. at 47]. According to defendant, CES already had been doing an annual top to bottom ranking of its employees, by department, in "peer groups" consisting of employees in the same classification and salary grade. The rankings were used for salary planning, and were based on the employees' overall "value to the organization" (which included such factors as specialty background versus organizational missions, vulnerability to programmatic changes and flexibility in assignments), contributions during the performance review period, quality of sustained perfor-

mance and years of relevant experience [St. Clair Dep. at 74–75, 78, 82]. For FY 1995, Messner had been ranked 10 out of 18 in the peer group of project engineers Level 9. He had been ranked 12 of 14 in the peer group for FY 1996 and 14 of 14 in the peer group for FY 1997 [Dobbs Aff. ¶ 13; Col. Ex. C]. Defendant indicates that in determining which project engineers to select for layoff, St. Clair used the salary planning rankings for FY 1995–1997 "as a starting point" [St. Clair Dep. at 35–38, 47–48]. He then considered "the skill mix of work that I knew we had to perform" [*Id.* at 47, 49]. St. Clair then developed a peer group of Level 9 project engineers (the same peer group Messner had been in for salary planning purposes) which St. Clair felt was the appropriate peer group to use for the RIF [St. Clair Dep. at 37–38, *see also* Long Dep. Ex. 15 at 2–11]. Out of that peer group, St. Clair recommended Messner, age 64, and R.M. Wagner, age 57, for the RIF. LM asserts that ten of the fourteen employees in the peer group were over age 40 and those who were retained included employees age 60, 55 and 50 [*Id.*, Long Dep. Ex. 15 at 2]. According to St. Clair, Messner was selected for the following reasons:

> because 'the IHEM program has been severely reduced and is essentially finishing up a few remaining projects this FY. Significantly reduced workload requiring his specialized skills. His performance has been good, but his overall breadth is not on par with his peers.'

[*Id.*, Long Dep. Ex. 15 at 3].

Defendant further notes that after making his selections, St. Clair prepared a detailed comparison of the capabilities and assignments for the Level 9 project engineers [St. Clair Dep. at 39–40, Long Dep. Ex. 15 at 4–9]. He asked Felte for some "basic input" on assignments and capabilities regarding Felte's employees, Messner and Noble Hensley [St. Clair Dep. at 39–40, 86–87, Ex. 66]. In regard to Messner's workload, St. Clair asserted:

> The IHEM program has been severely reduced and is essentially finishing up a few remaining projects. Prospects are so diminished in this area that both DOE–OR and the Y–12 Plant are eliminating their program focus for IHEM. Oliver's performance has been good, but his technical expertise is specialized and his overall project management breadth is not on par with his peers.

[St. Clair Dep. at 39–40, Long Dep. Ex. at 4–5].

St. Clair submitted his recommendation to Dobbs on Messner, Wagner and R.W. Jennings, a Level 11 project engineer in a separate peer group. Dobbs concluded that it would be too disruptive to "bump" any of the other project engineers in order to replace one of them with Messner. Thus, Dobbs met with the RIF Review Board on February 16, 1998, and Messner's selection for the RIF was approved [Dobbs Dep. at 31–32; Dobbs Aff. ¶ 14]. On February 25, 1998, Dobbs, Long and the Chair of the RIF Review Board met with LM's Vice–President of Human Resources, at which time the proposed RIF candidates were approved [Long Dep. at 39–47, Ex. 19; Dobbs Dep. at 69–70]. The persons selected for the RIF received notices on February 27, 1998, but remained on the company payroll until April 30, 1998. Defendant asserts that CES eliminated 28 positions in the RIF [Dobbs Dep. at 57, Long Dep. Ex. 14]. In the period between the receipt of the notice of termination and the actual termination date, plaintiff attempted to find employment within the company [Messner Dep. at 17–20, 44–56].

LM contends that plaintiff cannot establish a *prima facie* case of age discrimination under the ADEA or THRA on either the layoff claim or the failure to transfer claim. Defendant also asserts plaintiff cannot establish (1) that LM's proffered reason for plaintiff's termination—an economically-motivated RIF—is a pretext for age discrimination, or (2) that the articulated reasons why plaintiff was not trans-

ferred are pretextual. *See Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), *Smith v. Leggett Wire Co.*, 220 F.3d 752 (6th Cir.2000).

## SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment is proper if there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Sixth Circuit has expressly adopted a trilogy of United States Supreme Court cases which clarified the standards for summary judgment under Rule 56. *See Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) (*adopting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); and *Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). These cases hold that in order for a nonmoving party to defeat a motion for summary judgment, the nonmoving party must come forward with persuasive evidence to support his or her claim that there is a genuine factual dispute. "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir.1992)(*quoting Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir.1986)). The evidence must be viewed in a light most favorable to the nonmoving party, but the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also 60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987) (the nonmoving party must "present some significant evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial").

The moving party bears the burden of showing an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is satisfied, to defeat summary judgment the plaintiff must offer "concrete evidence from which a reasonable juror could return a verdict in his favor . . . ." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Once the moving party presents evidence sufficient to support a motion under Rule 56, Fed.R.Civ.P., the nonmoving party is not entitled to a trial simply on the basis of allegations. Plaintiff must set forth "specific facts," and only disputes over facts that might "affect the outcome of the suit under governing law" will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question. The judge is not to weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard for summary judgment mirrors the standard for directed verdict. There must be some probative evidence from which the jury may find for the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Bailey v. Floyd County Bd. of Education*, 106 F.3d 135, 140 (6th Cir.1997). If the court determines that a fair minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

## ADEA

To sustain an action under the Act, a plaintiff must show that age was a determining factor in the employer's decision to terminate him. Thus, under federal law, "[w]hen a plaintiff alleges disparate treatment, 'liability depends on whether the protected trait (*i.e.*, age) actually motivated the employer's decision.'" *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610, 113

S.Ct. 1701, 123 L.Ed.2d 338 (1993). "The plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.'" *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (*quoting Hazen Paper*, 507 U.S. at 610, 113 S.Ct. 1701); *accord Phelps v. Yale Security, Inc.*, 986 F.2d 1020, 1026 (6th Cir.1993)(plaintiff "must produce evidence that age was a factor in the employer's decision to discharge the Plaintiff and that but for this factor, the Plaintiff would not have been discharged").

■ The THRA is interpreted coextensively with the ADEA. *Parker v. Warren County Utility Dist.*, 2 S.W.3d 170, 172 (Tenn.1999)(the Tennessee Supreme Court's "policy of interpreting the THRA coextensively with Title VII is predicated upon a desire to maintain continuity between state and federal law"); *Carr v. United Parcel Service*, 955 S.W.2d 832, 834–35 (Tenn.1997); *Spicer v. Beaman Bottling Co.*, 937 S.W.2d 884, 888 (Tenn. 1996).

### PRIMA FACIE CASE

The Sixth Circuit has repeatedly held that age discrimination claims involve the same burden-shifting analysis as expressed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081 (6th Cir.1994); *see also Copeland v. Lockheed Martin Corp.*, No 99–5788, 2000 WL 923074 (6th Cir., June 30, 2000)(affirming summary judgment in an LM RIF case under the ADEA). If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *LaPointe v. UAW Local 600*, 8 F.3d 376, 379 (6th Cir.1993). If the defendant carries this burden, the presumption of the *prima facie* case is rebutted and the plaintiff must prove that the reason proffered by the defendant is a pretext for intentional age discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089 (citing *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817); *Reeves*, 120 S.Ct. at 2106; *LaPointe*, 8 F.3d at 379.

■ In order to establish a *prima facie* case of age discrimination, plaintiff must show (1) he is a member of a protected class (40 or above); (2) he suffered an adverse employment action; (3) he was qualified for the position; and (4) he was replaced by a younger person. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir.1995); *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1464 (6th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990). However, in a RIF case, the fourth criteria is modified: the plaintiff "must come forward with additional direct, circumstantial, or statistical evidence that age was a factor." *LaGrant v. Gulf & Western Mfg. Co., Inc.*, 748 F.2d 1087, 1090–91 (6th Cir.1984); *see also Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir.1999). To establish a *prima facie* case in a RIF, the plaintiff must present additional direct, circumstantial or statistical evidence "that the employer singled out the plaintiff for impermissible reasons." *Barnes*, 896 F.2d at 1464–65; *accord Ercegovich v. Goodyear Tire and Rubber, Co.*, 154 F.3d 344, 350 (6th Cir.1998).

### DIRECT EVIDENCE OF AGE DISCRIMINATION

■ Plaintiff contends that he has "direct evidence" that the decision to give him a RIF notice was because of his age. Plaintiff claims that shortly after plaintiff received the RIF notice, Felte came by his office and expressed surprise that plaintiff had received a RIF, and said he was going to talk to St. Clair about it (Messner Dep. at 42–43). Plaintiff asserts that Felte reported to him as follows:

Q: And what were you told by Mr. Felte?

A: Mr. Felte said that he had a discussion with Mr. Ed St. Clair. Mr. Ed St. Clair said that I was laid off because of age, because he thought I was going to take a VRIF anyway, and because of declining funds for the work I was doing.

Q: And this is what Mr. Felte's telling you?

A: That's what Mr. Felte told me.

[Messner Dep. at 8]. According to plaintiff, this conversation occurred on March 9, 1998 [Messner Dep. at 30], and he went immediately back to his office and jotted down notes concerning this conversation with Felte [Messner Dep. at 43–44].

■ In *Jacklyn v. Schering–Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir.1999), the Sixth Circuit noted that "[i]n discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." An ADEA plaintiff's case is submissible if it presents direct evidence that defendant fired the plaintiff because of his age. *Manzer*, 29 F.3d at 1081.

LM indicates that Felte has denied telling Messner that St. Clair said Messner was laid off because of his age [Felte Aff. ¶ 6–7]. St. Clair also denies having any conversation with Felte in which he said Messner was laid off because of his age or because he thought Messner would take a VRIF [St. Clair Aff. ¶ 5; St. Clair Dep. at 89–91,104–05]. Defendant argues that plaintiff's "evidence" is a classic "hearsay within hearsay" issue, and Messner must establish that "each part of the combined statements conforms with an exception to the hearsay rule...." Fed.R.Evid. 805; *See Jacklyn*, 176 F.3d at 927. *See Shapira v. Lockheed Martin Corp.*, 88 F.Supp.2d 813 n. 11 (E.D.Tenn.1998)(plaintiff's testimony is inadmissible hearsay). Plaintiff states the evidence is not hearsay and is clearly admissible pursuant to Fed.R.Evid. 805 and 801(d)(2)(D).

In *Jacklyn*, the plaintiff asserted that her previous district manager had told her that he had heard the regional manager say that he (the regional manager) did not want any "skirts" working for him. Plaintiff also indicated that when she asked her current district manager why she was having so much trouble with the regional manager, he told her that she was the only woman working for the regional manager. When she asked if she could change how the regional manager treated her, the district manager told her that they were male employees and that "you're not going to change that." Both the district managers denied the alleged statements, and the regional manager denied making the "skirts" statement. The plaintiff's current manager supervised her performance and was involved in evaluating her performance during the time period prior to her alleged constructive discharge. However, the Sixth Circuit held that these evaluations did not mean that the manager was acting in the scope of his employment when he allegedly told the plaintiff that the regional manager did not like her because she was female. 176 F.3d at 928. The Sixth Circuit explained that under "Fed.R.Evid. 801(d)(2)(D), a statement is not hearsay if it is offered against a party and is 'a statement by the party's agent or servant concerning *a matter within the scope of the agency or employment*, made during the existence of the relationship.'" *Jacklyn*, 176 F.3d at 927 (emphasis in original). With respect to the alleged statement by the plaintiff's first district manager, the appellate court found the statement was hearsay because the district manager (1) was not the plaintiff's supervisor during the time that the regional manager supervised her and (2) the district manager was not involved in any of the plaintiff's appraisals or the decisions which led to her alleged constructive discharge. *Id.* at 927–28. The appellate court noted that while the second statement was allegedly made by plaintiff's current district manager, it

was also hearsay, despite the fact that the current district manager "was involved in supervising plaintiff and evaluating her performance after [the regional manager] set out the changing expectations for plaintiff." *Id.* at 928. The court held that because the district manager

> was not involved in the actions that plaintiff claims led to her constructive discharge his statements did not concern matters within the scope of his agency or employment.... There is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer. The test is whether the statement concerns a matter within the scope of the agency or employment.

176 F.3d at 927.

The *Jacklyn* court was guided by *Hill v. Spiegel, Inc.,* 708 F.2d 233, 237 (6th Cir. 1983), which held as hearsay certain out-of-court statements that plaintiff was terminated because of his age, even though the out-of-court statements were supposedly made by three managers. It was felt significant by the court that the managers in *Hill* were not involved in the decision to terminate the plaintiff, and there was no evidence that the statements were made concerning a matter within the scope of their agency or employment. The *Jacklyn* court also relied upon *Mitroff v. Xomox Corp.,* 797 F.2d 271 (6th Cir.1986), in which the Sixth Circuit held as inadmissible certain statements by the plaintiff (and another witness) that an assistant personnel manager had told them there was a pattern of age discrimination by their employer. In *Mitroff,* the court found that there was no showing that the out-of-court statement by the personnel manager concerned a matter that was within the scope of his employment.

In *Shapira,* the plaintiff sought to introduce the affidavit of an individual who testified that an ORNL manager told him that the plaintiff's supervisor at the time had said that the plaintiff was "good at her

work, but difficult." Judge Jordan of this court held that the "conversation is clearly hearsay and inadmissible evidence." 88 F.Supp.2d at 828 n. 11; *see* Fed.R.Civ.P. 56(c) ("affidavits must set forth facts admissible into evidence)."

Plaintiff argues that Felte's statement to plaintiff clearly concerned a "matter within the scope of his agency or employment" and it was clearly made during the existence of the relationship [Fed.R.Evid. 801(d)(2)(D)]. Plaintiff relies on the case of *Moore v. KUKA Welding Sys.,* 171 F.3d 1073 (6th Cir.1999):

> The court allowed plaintiff's witness, Alan Marsee, to testify over defendants' objection that Marsee's brother-in-law, David Morris, a machine builder at KUKA, told Marsee at a social occasion at Marsee's home that Tom McCauley, plaintiff's supervisor, told Morris "some bad stuff's going to happen in the back" (presumably referring to the friction welding area) and that Marsee should stay out of it unless he wanted to be fired. The district court allowed this alleged "double hearsay" under Federal Rule of Evidence 802(d)(2) as a statement against interest that is non-hearsay. McCauley, the supervisor, was also a witness in this case and was subject to examination by both sides....

*Id.* at 1081. Plaintiff indicates that both Felte and St. Clair can take the stand as witnesses, and unlike the situation in *Moore,* both Felte and St. Clair were supervisors acting within the scope of their employment.

It appears, however, that the decision found the out-of-court statement admissible because the decision maker had instructed the declarant to "pass the message along" to the person who testified in court. In *Jacklyn,* the Sixth Circuit noted that "[t]here is a critical difference between making a statement while one is an employee and having the actual or implied authority to make such a statement on behalf of your employer." 176 F.3d at 927.

There are no facts upon which this court could conclude that "within the meaning of Rule 801(d)(2)(D)," St. Clair authorized Felte to make any statement to Messner concerning the reasons for Messner's layoff. The fact that a statement is made by a manager, even a manager who supervises the plaintiff, is not sufficient to establish that the manager is authorized to speak on the subject matter at issue. *EEOC v. Allen Petroleum Co. of East Tennessee, Inc.*, 89 F.3d 833 (6th Cir.1996).

Messner's testimony as to what Felte allegedly said that St. Clair allegedly said is therefore inadmissible hearsay. There is no evidence that Felte had any involvement in the RIF decision or that Felte's purported statement was concerning a matter within the scope of his employment. Messner testified that "to the best of my knowledge" Felte had no role in the RIF decision. He does not claim that Felte discriminated against him [Messner Dep. at 26–27]. St. Clair testified that Felte had no input into the decision to give Messner a RIF notice [St. Clair Aff. ¶ 6; St. Clair Dep. at 28–29]. Felte said that St. Clair never talked to him about any potential layoff that might involve Messner, and Felte did not attend any meetings at which RIF decisions were discussed [Felte Dep. at 45–47]. Felte was not aware that Messner was slated to be laid off until after Messner was given a RIF notice [*Id.*; St. Clair Dep. at 56–57], because the selection of Messner for the RIF was not "a matter within the scope of [Felte's] agency or employment." 176 F.3d at 927. The request that Felte summarize Messner's "capabilities and assignments," after St. Clair made his decision, was insufficient, under *Jacklyn,* to establish that Felte was a participant in that decision. The information provided by Felte was not a performance evaluation, or a recommendation on the RIF decision (which St. Clair had apparently already made). It merely states the assignments and capabilities of Felte's two employees.

Therefore, the court finds that Messner has presented no "direct evidence" of age discrimination in the layoff decision. Admitting the hearsay testimony would be contrary to Fed.R.Evid. 801(d)(2)(D). Thus, plaintiff must meet his *prima facie* case by presenting circumstantial or statistical evidence that his age was the reason he was chosen for termination in the RIF.

## CIRCUMSTANTIAL EVIDENCE

█ Plaintiff argues that there is strong circumstantial evidence of discrimination.

## BUMPING

Messner opines that he should have been retained and that "younger" Level 9 project engineers should have been laid off because of "my experience and my age and my time with the company" [Messner Dep. at 80]. Plaintiff claims that defendant should have "bumped" any one of a number of younger employees and then placed plaintiff in one of the positions, instead of giving plaintiff a RIF.

The RIF guidelines set forth six criteria for retention, only one of which is company service. Under its guidelines, LM did not make decisions on the basis of seniority. Thus, Messner's age did not afford him special treatment in the RIF. *Williams v. General Motors Corp.*, 656 F.2d 120, 129 (5th Cir.1981)(the ADEA "does not place an affirmative duty upon an employer to afford special treatment to members of the protected age group"); *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir.1991)("The ADEA only bars discrimination on account of age; it does not place on employers an affirmative obligation to retain older workers whenever a reduction in staff becomes necessary").

█ As for plaintiff's contention that he was "better qualified" than the younger project engineers who were retained, such opinion is nothing more than a conclusion, which is insufficient to establish a *prima facie* case. *LaGrant v. Gulf & Western Mfg. Co.*, 748 F.2d 1087, 1090–91 (6th Cir. 1984) (an employee's "subjective determi-

nation that he was better qualified than" others who were retained is insufficient to establish that age played any role in the decision to terminate him). An employee's evaluation of his own performance or qualifications is irrelevant as a matter of law. *Wrenn v. Gould,* 808 F.2d 493, 502 (6th Cir.1987)(employee's "perception of his competence, and the incompetence of those competing against him, is irrelevant"). In *Shapira v. Lockheed Martin Corp.,* 88 F.Supp.2d 813 (E.D.Tenn.1998), Judge Jordan noted that "[i]n the Sixth Circuit, it is the manager's motivation that is the key factor, not the employee's perception or even the perception of [his] coworkers about the employee's abilities or skills." 88 F.Supp.2d at 829.

■ In this case, plaintiff was ranked 14th out of 14 Level 9 project engineers in the FY 1997 salary planning rankings, and was 12th out of 14 in the FY 1996 rankings [St. Clair Dep., Ex. 64]. Plaintiff's conclusory opinions based on his own view of his competence are insufficient to establish a *prima facie* case. The court finds it is significant that his IHEM work was all but eliminated. Most importantly, Messner has admitted that he knows of no one else in this RIF who was allowed to bump another employee who was, in turn, laid off [Messner Dep. at 130]. LM does not allow bumping in a RIF of exempt salaried employees [Pierce Aff. ¶ 5]; this fact was indicated on the RIF notice [Messner Dep. Ex. 1]. Dobbs testified that CES management determined it would be extremely disruptive to bump project engineers who were in the midst of ongoing projects, or who had developed long-term relationships with customers, and replace them with others who had no work. Dobbs decided not to do so for the plaintiff or anyone else [Dobbs Aff. ¶ 10]. Under the ADEA, an employer is under no duty to "displace workers with less seniority when the employee's position is eliminated as part of a work force reduction." *Barnes,* 896 F.2d at 1469; *Ridenour v. Lawson Co.,* 791

F.2d 52, 57 (6th Cir.1986) ("no bumping" policy is not age discrimination).

### *VALUE*

Plaintiff asserts that in determining the peer group rankings that were used in the RIF planning process, St. Clair admitted the process was largely subjective [St. Clair Dep. at 35–38, 75]. St. Clair testified that on the October 7, 1997 ranking, he ranked plaintiff last because of his opinion concerning plaintiff's "sustained performance," "his value to the organization," and his "flexibility" and "versatility" [St. Clair Dep. at 75]. Plaintiff contends that Felte contradicts these assertions in a letter of recommendation written on May 20, 1998:

> It is a pleasure to recommend Mr. Messner as one of the most excellent and versatile engineers that I have worked with during my 30–year engineering career.

Ex. 11. Plaintiff states that in the light most favorable to plaintiff, the statement of Assignments/Capabilities prepared by Felte on February 10, 1998 indicates: flexibility, versatility and sustained performance, and it also indicates a "breadth" of assignments [*See* St. Clair Dep. at 39–43]:

> He is a very capable and versatile engineer and can adapt quickly to new technology and methodologies.

[Ex. 7]. Plaintiff notes that Felte described him as "very competent technically," "a pretty good plant engineer" and "a jack of all trades" [Felte Dep. at 14]. Plaintiff argues that the above descriptions are not consistent with someone who has weak skills or who lacks depth.

As noted by Judge Jordan in *Shapira,* "it is the manager's motivation that is the key factor, not the employee's perception **or even the perception of [his] coworkers about the employee's abilities or skills."** 88 F.Supp.2d at 829 (emphasis added). It appears that there is a difference of opinion between St. Clair and Felte as to Messner's "versatility" and "adaptability" as an engineer. However, a

difference of opinion falls far short of establishing that St. Clair's assessment of Messner's abilities was age discriminatory or pretextual. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 2000 WL 992232 (6th Cir. July 17, 2000). LM does not dispute that Messner was "presumptively competent." He had survived several rounds of layoffs which had reduced the CES workforce by 43% before his RIF took place. The true issue is whether there was a valid business reason for his layoff. In *McGrath v. Lockheed Martin Corp.,* No. 3–98–cv–299 (E.D.Tenn. March 31, 2000), Judge Jordan explained that even if the manager incorrectly evaluated the transferability of the plaintiff's skills, this failed to defeat summary judgment because "neither this court nor the trier of fact is to question the soundness of the employer's business judgment." Slip op. at 16. The ADEA is designed to protect older employees from discrimination, not to restrict the employer's rights to make *bona fide* business decisions. *See Blackwell v. Sun Elec. Corp.,* 696 F.2d 1176, 1179 (6th Cir.1983). There is no evidence in the record that St. Clair was motivated to rank plaintiff adversely because of plaintiff's age.

### REVIEW SYSTEM

Plaintiff contends that defendant's review system was a sham [*See* Ex. 17 at 5, 19]. Plaintiff states that the RIF Review Board rubber stamped the list of candidates as presented by Dobbs, and the Legal RIF Review also rubber stamped the layoff list [Dobbs Dep. at 31–32, 69]. Plaintiff contends the only question raised by the RIF Review Board was about plaintiff because he was placed on a Layoff Comparison Form with 13 younger employees, and from this "peer group" only plaintiff and another older employee, Wagner (age 57) were slated for layoff [Dobbs Dep. at 31–32]. Plaintiff claims the Board was afraid that Messner's selection for layoff would not be "defensible" should he challenge his selection claiming age discrimination especially if the Layoff Comparison Form that was presented to the Board was utilized. *Id.*

Plaintiff has not presented any evidence that his age was improperly considered in the review process. The court finds that the plaintiff's allegations related to the RIF review fail to raise a genuine issue of material fact that age played any part in the application of the RIF policy to the plaintiff.

### SENIORITY

Plaintiff states that he had the most seniority in the groups with which he was compared, yet he always came out first for layoff. Defendant asserted on the first Layoff Comparison Form that plaintiff was selected for layoff because:

> The IHEM program has been severely reduced and is essentially finishing up a few remaining projects this FY. Significantly reduced workload requiring his specialized skills. His performance has been good, but is overall breadth is not on par with his peers.

Ex. 14. On the second Layoff Comparison Form prepared on February 16, 1998 comparing plaintiff to other Engineer IV, Grade 9 employees in defendant's HVAC department, defendant asserted plaintiff was selected for layoff because:

> Candidate has been involved in Project Management for several years and has not been involved in design. MSE's needs are for engineers with high skills in today's current technology. Mr. Messner has the weakest skills of this peer listing.

Ex. 16. On the final Layoff Comparison Form that compared plaintiff to himself, dated February 16, 1998, defendant asserted plaintiff was selected because:

> The IHEM program has been severely reduced and is essentially finishing up a few remaining projects this FY. Significantly reduced work load requiring his specialized skills. His performance has been good, but skill set is unique to this

individual and is not interchangeable with other Y–12 Project Engineers.

Ex. 12.

As noted previously, the RIF guidelines set forth six criteria for retention, only one of which is company service. It is therefore clear that defendant does not make decisions based on seniority. The ADEA does not obligate an employer to retain older workers in a necessary RIF. *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir.1991).

## UNIQUENESS

Plaintiff contends that "uniqueness" was supposed to be a positive thing for retention of employees [*See* Ex. 17 at 26]. LM notes that "uniqueness" is a consideration in assessing whether the employee has "critical skills," *i.e.*, skills that are important "to the organization/component/installation to maintain core competencies."

The record reveals that plaintiff has not established that the IHEM work, which was decreasing, meets this definition of critical skills. It is particularly significant that plaintiff had not done any design work for seven years.

## IHEM PROGRAM

Plaintiff contends the IHEM program was not finished in FY 1998, and an IHEM program (perhaps in a different form) is still in existence, and that Mike Davenport (DOB 11/12/55), the same person who took over plaintiff's remaining projects, was in charge of it [St. Clair Dep. at 1, 127–128].

The IHEM program was canceled by Congress in FY 1997. Between FY 1997 and plaintiff's RIF in April 1998, his IHEM workload had been reduced from 14 ongoing projects to only 2 and his IHEM work was 20% or less of a full-time position. It appears that plaintiff is referring to the Energy Savings Performance Contract (ESPC) group which was later transferred to ORNL. Plaintiff has admitted that this work was different from the work he was doing [Messner Dep. at 128–29].

As to any contentions regarding Davenport, he clearly was not similarly situated to plaintiff. At the time of Messner's RIF selection, Davenport was a Grade 12 manager over the Technical Specialties Group in the Facility Engineering Services Organization [Dobbs Dep.]. Davenport was supervising 32 employees, including design engineers supporting the IHEM work. Messner was a Grade 9, project engineer. Davenport was not a peer of plaintiff's and Messner could not have "bumped" Davenport from a higher rated management position.

## DOWNGRADES

Plaintiff argues that it could be concluded that St. Clair was biased against plaintiff for reasons due to this age. Plaintiff notes that on two occasions, St. Clair downgraded Felte's recommended "CX" (consistently exceeds) for plaintiff to a "CM" (consistently meets). Plaintiff claims that if St. Clair had not downgraded the CX recommended appraisals for 1995 and 1997, St. Clair would have been hard pressed to rank the plaintiff last and to lay him off in 1998. St. Clair also rejected Felte's recommendation to promote plaintiff to Engineering Specialist in October 1995, but accepted the recommendation to promote a younger similarly situated employee. The "criteria" St. Clair stated he used in determining whether to promote plaintiff was "sustained performance and looking at value to the organization, flexibility and versatility" [St. Clair at 74–75].

Plaintiff also argues that if his performance had not been downgraded, he would have had better ratings than three engineers who were transferred to Bechtel Jacobs in March 1998, and that presumably, he would have been transferred to Bechtel Jacobs instead of receiving a lay off. *Id.* at 22.

Messner had previously denied that he was claiming he should have been transitioned to Bechtel Jacobs [Messner Dep. at 53]. Regardless, for those positions, LM was required to transfer employees who were funded by the EM work that DOE

was transitioning to Bechtel Jacobs [Dobbs Aff. ¶7]. All of the project engineers who transitioned from St. Clair's organization to Bechtel Jacobs had been performing EM work [St. Clair Supp. Dec. ¶5; Dobbs Dep. at 47–48, 51–52]. Only 2 of the engineers mentioned by plaintiff actually transitioned to Bechtel Jacobs and both had previously performed EM work [St. Clair Supp. Aff. ¶5]. Messner admits that he had not performed any EM work [Messner Dep. at 52].

There is no evidence in the record that St. Clair was motivated to give plaintiff downgraded ratings because of his age. St. Clair's evaluations were generally quite favorable. Plaintiff cannot rely on his personal conclusory opinions to support his contentions. His own conclusory assessment of his job skills is irrelevant. *Wrenn v. Gould*, 808 F.2d 493, 502 (6th Cir.1987).

### VRIF CONNECTIONS

Plaintiff's engineering projects were assigned to Davenport, Engineering Specialist, Grade 12, who is still employed by defendant. According to plaintiff, defendant moved Davenport into Project Engineering in 1998 while defendant was laying off two older project engineers in Messner and Wagner [St. Clair Dep. at 142–145, 146–147]. Plaintiff argues that it could be concluded that defendant manipulated the VRIF connection "policies" in selecting younger employees to be "saved" instead of plaintiff.

As noted earlier, Davenport was not similarly situated to plaintiff. At the time of plaintiff's RIF selection, Davenport was a Level 12 department manager over the Technical Specialties Group in the Facility Engineering Organization [Dobbs Dep.]. Davenport was supervising 32 employees in Technical Specialties, including the design engineers supporting the IHEM work. Messner was a Level 9 project engineer; thus, Davenport was not a peer of Messner's in the RIF process and Messner could not have "bumped" Davenport from a higher rated management position in a different department of CES. It ap-

pears logical that Davenport would absorb the remaining IHEM work, since he had supervised the IHEM design engineers [Davenport Aff. ¶6]. Defendant contends Davenport transferred into Y–12 Project Engineering in May 1998 to bring some "senior leadership" into the Y–12 Engineering Organization and to work more closely with department manager Ted Burger, so that Burger might ultimately have more time to work on modernization planning for Y–12 [St. Clair Dep. at 142, 145–146]. The court finds that one cannot reasonably conclude that Davenport should have been laid off instead of Messner and cannot question under the evidence present defendant's business decision to transfer Davenport into Y–12 to ultimately replace Burger.

As to the other retained employees who plaintiff indicated were "treated better," they either did not receive RIF notices and are therefore not similarly situated to Messner for purposes of his failure to transfer claim, *King v. Buckeye Rural Elec. Cooperative*, 2000 WL 491517 (6th Cir.2000), or Messner was not qualified to perform the work. Further, it appears there was no discernable pattern of age preference in the decisions regarding termination or retention. As noted by defendant, while employees like Messner (age 64) and Wagner (age 57) were terminated, so were employees like Breeden (age 34), Kinney (age 38) and Long (age 39). And while some younger employees like Bass (age 43), Holt (age 41), Lowery (age 30) and Madgett (age 31) were saved by a transfer, so were older employees like Stone (age 51) and Peters (age 52).

As to plaintiff's other claims, he must establish a *prima facie* case as to each position he claims he was discriminatorily not awarded. Plaintiff has not attempted to show he was qualified for any of the other positions which other CES employees with RIF notices received. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351. He has not shown that he was "similarly situated in all of the rele-

vant respects" to any of the employees receiving the positions. *Id.*, 154 F.3d at 353.

## FAILURE TO TRANSFER

Messner claims that he was improperly not "transferred" to another position after he was selected for the RIF. Plaintiff has identified three positions: the position which ORNL offered to Madgett, the VRIF match for Eiler, and a vague assertion of a "process engineer" position in Building 9204–2E.

■ According to the Sixth Circuit case law, "[w]here an employer reduces his workforce for economic reasons, it incurs no duty to transfer an employee to another position within the company." *Ridenour v. Lawson Co.*, 791 F.2d 52, 57 (6th Cir. 1986). The "ADEA does not require [plaintiff's] employer to terminate younger employees in order to open positions for older workers." *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612 (7th Cir.2000) (*citing Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir.1992)). But when "an employer responds to a RIF by transferring employees to available positions, it may not refuse to transfer older employees based on their age." *Id.* (*citing Kusak v. Ameritech Info. Systems Inc.*, 80 F.3d 199, 201 (7th Cir.1996)); *accord Ercegovich*, 154 F.3d at 351.

In *Ercegovich*, the Sixth Circuit held that a "plaintiff denied an opportunity to transfer [in a RIF] establishes a *prima facie* case of age discrimination when he or she produces evidence demonstrating that 1) he or she is a member of a protected class; 2) at the time of his or her termination he or she was qualified for other available positions within the corporation; 3) the employer did not offer such positions to the plaintiff; and 4) a similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer to an available position, or other direct, indirect, or circumstantial evidence supporting an inference of discrimination." 154 F.3d at 351.

## MADGETT

As to the Madgett "transfer" claim, it appears plaintiff cannot establish that a "similarly-situated employee who is not a member of the protected class was offered the opportunity to transfer." In determining whether plaintiff and Madgett are similarly-situated, they must be "similarly-situated in all relevant respects." *Ercegovich*, 154 F.3d at 352. Plaintiff need not show complete identity but must show "substantial identity."

Messner does not have "substantial identity" with Madgett in that she was working in the ESPC group supporting the ORNL Energy Division for over a year before that organization requested the entire group to transfer. Plaintiff had never done any ESPC work. Madgett was not transferred alone to a vacancy at ORNL. Rather, the entire ESPC group, including Madgett, was requested by the customer for their specific experience in the customer's ongoing work. Plaintiff did not have this job-specific experience. Thus, plaintiff and Madgett are not similarly situated with respect to the ESPC work and plaintiff cannot establish a *prima facie* case with respect to this "failure to transfer" claim.

## EILER

Plaintiff cannot establish the second and fourth prongs of the *prima facie* case with respect to the VRIF match for Eiler. Eiler was experienced in piping design and was replaced by R.W. West, who was also experienced in piping design. Eiler and West, unlike Messner, worked in R.M. Cannon's organization. Cannon determined that he needed to retain Eiler's piping systems design experience if he was going to allow Eiler to take a VRIF, and West was the only engineer with a layoff notice who had the necessary piping skills. Dobbs considered plaintiff and other impacted engineers for the Eiler VRIF match, but none had the piping systems design experience that Cannon needed to retain in the event Eiler took a VRIF.

Plaintiff was simply not qualified to do the piping work that was needed, nor was he similarly situated to West, who was qualified. Thus, he cannot establish a *prima facie* case on the Eiler VRIF match.

Defendant also notes that plaintiff is arguing here that defendant should have placed Messner in the EUO position vacated by the person Messner claims he "temporarily replaced." Defendant asserts that according to plaintiff's own testimony and his written documentation, Messner reacted negatively to the EUO assignment he is relying on before it even began [Messner Dep. at 156]. Messner complained bitterly about the assignment and characterized it as "dogwork" [Felte Aff. ¶ 3], and suggested the names of other people who should perform the work because "[a]ll of these guys are younger than I and better able to adapt to the drastic change in the nature of that work." *Id.* It clearly could not be concluded that LM committed age discrimination by its failure to re-assign Messner to what he himself had previously characterized as "dogwork." It is further significant that plaintiff admitted that if he had not objected to the EUO assignment, he "would still have a job." [Messner Dep. at 208].

### *"PROCESS ENGINEER"*

The third "transfer" claim to which Messner alluded was a "process engineer" position in Building 9204–2E. Messner could not identify the decisionmaker for this position, the organization in which the opening allegedly occurred, that there even was an opening, the person who was selected to the position, when the person was selected, or whether the decisionmaker even knew of Messner's interest. Messner said he contacted a person named "John" with whom he had previously worked and who later called Messner back and said the position had been filled [Messner Dep. at 19–20]. Messner has failed to establish a *prima facie* case of discrimination with respect to this claim because he has failed to identify an available position, whether he was qualified for

it, considered for it, or that the person selected (if anyone) was substantially younger than he. In *Sauzek v. Exxon Coal USA Inc.*, 202 F.3d 913, 919 (7th Cir.2000), the Seventh Circuit held that "evidence of failure to transfer must include proof that the employee was qualified for and applied for specific jobs that were available during the RIF [citation omitted]. To demonstrate that a failure to transfer was discriminatory, 'an employee must do more than show a general interest in obtaining some job.'" *Id.* at 919 (*quoting Taylor v. Canteen Corp.*, 69 F.3d 773, 780 (7th Cir.1995)).

Messner has made no effort whatsoever to establish a *prima facie* case with respect to the alleged position in Building 9204–2E. His testimony does not establish that there was an opening, that he applied for the opening, that he was qualified for the opening, who obtained the opening, or that a substantially younger employee was selected. Messner has not established a *prima facie* case of discrimination on this claim. *Ercegovich*, 154 F.3d at 351.

### *BECHTEL JACOBS*

As noted previously, LM was required to transfer employees to Bechtel Jacobs who were funded by the EM work that DOE was transitioning to Bechtel Jacobs [Dobbs Aff. ¶ 7]. All of the project engineers and virtually all other engineering professionals were required to have been supporting EM work. All of the project engineers who transitioned from St. Clair's organization to Bechtel Jacobs had been performing EM work [St. Clair Supp. Dec. ¶ 5; Dobbs Dep. at 47–48, 51–52]. Messner admits that he had not performed any EM work [Messner Dep. at 52]. He cannot indicate any project engineer who transitioned to Bechtel Jacobs who did not perform EM work.

### *STATISTICAL EVIDENCE*

Defendant notes that in the reply brief, plaintiff has made two "pseudo-statistical" arguments in an attempt to show that

younger employees were treated more favorably in the RIF. Plaintiff argues that the average age of the Level 9 project engineers was 46.14 and the average age of the Level 9 project engineers laid off (Messner and Wagner) was 60.5. He states that after the RIF, the average age of the remaining project engineers was 43.75 [Messner brief at 44]. Defendant argues that the statistics are invalid because they are based upon a total statistical sample of only 14 project engineers and a departure of just 2 employees. Plaintiff's second "statistical" argument is that, of the CES employees given RIF notices in February 1998, the average age of the ones who "were transferred" is 40.75, while the average age of those who left the payroll was 50.7 [Messner Brief at 40–41]. Upon review, it appears to the court that plaintiff's analysis lacks probative value and is, therefore, insufficient to show age discrimination.

For the foregoing reasons there is no direct, circumstantial, or statistical evidence that plaintiff's layoff or the failure to transfer him to other positions was the result of age discrimination. Plaintiff's failure to establish a *prima facie* case on these claims mandates the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, 106 S.Ct. 2505.

### EVIDENCE OF PRETEXT

Defendant further posits that even if plaintiff could establish a *prima facie* case, his complaint should be dismissed because he cannot prove that the reasons articulated by LM for his layoff are a pretext for age discrimination.

As indicated in *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), "to make a submissible case on the credibility of his employer's explanation, plaintiff is required to show by a preponderance of the evidence 'either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge' " (emphasis in original). *See also Chappell v. GTE Products Corp.*, 803 F.2d 261, 266 (6th Cir.), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987).

In the view of the court, the workforce reductions and budget constraints imposed by Congress and DOE more than satisfy LM's burden to articulate a legitimate nondiscriminatory reason for plaintiff's termination. *Barnes*, 896 F.2d at 1465, *Copeland v. Lockheed Martin Corp.*, No. 99–5788, 2000 WL 923074 (6th Cir. June 30, 2000).

Once an employer can articulate a nondiscriminatory reason for its actions, the presumption of discrimination raised by the *prima facie* case is lost, and the plaintiff must then prove that the reasons proffered by the defendant are a pretext for discrimination. *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089 (*citing McDonnell Douglas*, 411 U.S. at 894, 93 S.Ct. 1817); *La Pointe v. UAW Local 600*, 8 F.3d 376, 379 (6th Cir.1993). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 120 S.Ct. at 2106 (*citing Burdine*, 450 U.S. at 253, 101 S.Ct. 1089).

In attacking an employer's explanation for the discharge, a plaintiff may not rely upon "mere personal beliefs, conjecture and speculation." *Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir.1986). Nor can a plaintiff prove pretext merely by asserting that a better business decision could have been made. *See Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1179 (6th Cir.1983) ("[t]he ADEA was designed to protect older workers from arbitrary classifications on the basis of age, not to restrict the employer's rights to make *bona fide* business decisions."). A plaintiff cannot show pretext by merely claiming that he was "better qualified" than younger employees who were retained, as an employee's evaluation of his own performance or qualification is irrele-

vant. *Wrenn*, 808 F.2d at 502. In order to show pretext with regard to the relative qualifications between a plaintiff and any other employee, the plaintiff must demonstrate that defendant's business judgment "was so ridden with error that defendant could not have honestly relied upon it." *Lieberman v. Gant*, 630 F.2d 60, 65 (2nd Cir.1980); *see also, In re Lewis*, 845 F.2d 624, 633 (6th Cir.1988).

 The record before the court reveals that Messner was selected for the RIF because his IHEM work was all but eliminated. None of the evidence on which plaintiff relies establishes that the elimination of the IHEM program did not actually motivate the RIF selection. LM does not use seniority (or age) to "bump" project engineers, and it appears Dobbs reasonably determined it would be exceedingly disruptive to do so [Pierce Aff. ¶ 6; Dobbs Aff. ¶ 10]. Messner admits that CES's upper management would be more knowledgeable than he as to how disruptive this bumping would have been [Messner Dep. at 85–86, 88, 90, 92, 94, 97, 99, 103, 106 and 110].

Messner's conclusory claim that other employees received treatment that was "preferential" fails to raise an issue of material fact to defeat summary judgment. As to plaintiff's transfer claims, it has been established that Messner was not qualified for them and age was not a factor [*See* Krieg Aff. ¶¶ 3–5]. Messner cannot establish age discrimination by asserting that a better business decision could have been made. *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1179 (6th Cir.1983).

Messner has made no effort to demonstrate that the RIF was unnecessary or otherwise had no basis in fact, nor does he argue that it was insufficient to motivate his discharge. When viewed in the light most favorable to the plaintiff, Messner does not submit any evidence that the matters and decisions of which he complains are in any way related to his age.

For the reasons discussed above, the court finds that there are no genuine issues of material fact that defendant discriminated against plaintiff based on his age. The defendant's motion for summary judgment will be granted and the plaintiff's claims under the ADEA and THRA will be dismissed.